PEOPLE v HYATT

Docket No. 325741. Submitted May 18, 2016, at Lansing. Decided
     July 21, 2016, at 9:10 a.m. Leave to appeal sought.

Kenya A. Hyatt was convicted following a jury trial in the Genesee
     Circuit Court of first-degree felony murder, MCL 750.316(1)(b),
     conspiracy to commit armed robbery, MCL 750.529, armed rob-
     bery, MCL 750.529, and possession of a firearm during the
     commission of a felony, MCL 750.227b(1). Defendant was 17 years
     old at the time of the crimes. The court, Judith A. Fullerton, J.,
     sentenced defendant to life in prison without the possibility of
     parole for the first-degree murder conviction. Defendant ap-
     pealed, and the Court of Appeals consolidated defendant's appeal
     with the appeals of his codefendants. *People v Perkins*, unpub-
     lished order of the Court of Appeals, entered April 26, 2016
     (Docket Nos. 323454, 323876, and 323741). In a published opinion
     released January 19, 2016, the Court of Appeals, TALBOT, C.J., and
     CAVANAGH, and K. F. KELLY, JJ., concluded that *Miller v Alabama*,
     567 US 460 (2012), did not require that a jury determine a
     juvenile offender's eligibility for a life-without-parole sentence
     under the sentencing scheme set forth in MCL 769.25. *People v
     Perkins*, 314 Mich App 140 (2016). The *Perkins* Court asserted
     that *People v Skinner*, 312 Mich App 15 (2015), was incorrectly
     decided to the extent it concluded that before a juvenile defendant
     may receive a life-without-parole sentence, a jury, not a judge,
     was to be the decision-maker at the *Miller* hearing required by
     MCL 769.25. The *Perkins* Court noted the conflict with *Skinner*
     pursuant to MCR 7.215(J)(2) and stated that it was compelled to
     follow *Skinner* and remand for resentencing so that a jury could
     determine whether defendant should receive a sentence of life in
     prison without the possibility of parole. The Court of Appeals
     ordered that a special panel be convened to resolve the conflict
     with *Skinner* and vacated Part IV(C) of the *Perkins* opinion.
     *People v Perkins*, 314 Mich App 801 (2016). The Court of Appeals
     vacated its earlier order consolidating defendant's appeal with
     that of his codefendants to allow defendant's appeal to proceed
     before the special panel.

On consideration by the special panel, the Court of Appeals *held*:

1. Because juveniles have less culpability and a greater capacity for reform, they are constitutionally different from adults for purposes of sentencing. Specifically, juveniles lack maturity and have an underdeveloped sense of responsibility, they are more vulnerable to negative influences and outside pressures, they have limited control over their environment, and their character is not as well-formed as an adult's; therefore, a juvenile offender's youth and those attendant characteristics of youth must be considered when a juvenile is sentenced. The *Miller* Court recognized that the Eighth Amendment bans the death penalty for juveniles and that a life-without-parole sentence for juveniles, which is the harshest penalty that may be imposed on a juvenile, was like being sentenced to the death penalty. For that reason, the *Miller* Court concluded that the Eighth Amendment's right against disproportionate punishment, US Const, Am VIII, bars mandatory life-without-parole sentences for juvenile offenders in homicide cases because it prevents the sentencing court from considering the juvenile's youthfulness, diminished culpability, and increased potential for reform. Although the Court did not impose a categorical ban on life-without-parole sentences for juveniles, it stated that imposing that sentence would be unusual because of the great difficulty of distinguishing at that early age between the juvenile offender whose crime reflects unfortunate yet transient immaturity and the rare juvenile offender whose crime reflects irreparable corruption. *Miller*, however, did not suggest that a defendant has the right to a jury determination of a life-without-parole sentence. Instead, *Miller* simply held that the Eighth Amendment required a framework of protections to ensure that if a sentencing court imposed a life-without-parole sentence on a juvenile offender, the individualized sentence would be proportionate to the offender and the offense. The sentencing considerations set forth in *Miller* are sentencing factors that mitigate punishment through consideration of the juvenile offender's age, not elements that must be found before a more severe punishment is authorized.

2. In *Montgomery v Louisiana*, 577 US ___; 136 S Ct 718 (2016), the United States Supreme Court concluded that *Miller* applied retroactively and admonished that for all but the rarest of children whose crimes reflect irreparable corruption and permanent incorrigibility, a sentence of life in prison without the possibility of parole would be a disproportionate sentence. While the Court concluded that *Miller* was a substantive rule, it also

noted that the holding had a procedural component that requires a sentencing court to consider a juvenile offender's youth and attendant characteristics before determining that life without parole is a proportionate sentence. The Supreme Court in *Montgomery* acknowledged that *Miller* did not require trial courts to make findings of fact regarding a child's "incorrigibility" but emphasized that in order to avoid a disproportionate punishment in violation of the Eight Amendment, it was incumbent on states to develop procedures to enforce *Miller*'s substantive guarantee of individualized sentencing for juvenile offenders facing the possibility of life without parole.

3. In a line of cases involving the Sixth Amendment of the United States Constitution that began with *Apprendi v New Jersey*, 530 US 466 (2000), and concluded with *Alleyne v United States*, 570 US ___; 133 S Ct 2151 (2013), the United States Supreme Court held that other than a prior conviction, any fact that increases either the statutory floor or ceiling of a criminal defendant's sentence beyond that which a court may impose solely on the basis of facts reflected in the jury's verdict or admitted by the defendant must be submitted to a jury and proved beyond a reasonable doubt. As long as the sentencing court sentenced the defendant within the statutorily prescribed limits, any facts functioned as sentencing factors, rather than as elements of an aggravated offense. The touchstone for determining whether a fact must be found by a jury beyond a reasonable doubt is whether the fact constitutes an "element" or "ingredient" of the charged offense. By definition a fact is an element of the offense and must be submitted to the jury if it increases the punishment above what is otherwise legally prescribed.

4. Beginning with *Ring v Arizona*, 536 US 584 (2002), and culminating with *Hurst v Florida*, 577 US ___; 136 S Ct 616 (2016), the United States Supreme Court extended *Apprendi* and ultimately concluded that the respective statutes in Arizona and Florida violated the Sixth Amendment because although the statutory maximum for the homicide offense of which the adult defendant was convicted authorized the death penalty, a sentencing court could only impose the death penalty on the basis of findings beyond the jury's verdict; in other words, the death penalty was not available but for judicial fact-finding regarding certain aggravating factors that had not been submitted for jury determination beyond a reasonable doubt. However, *Apprendi* and its progeny do not prohibit judicial fact-finding. Instead, a judge acting within the range of punishment authorized by statute may exercise his or her discretion—and find facts and

consider factors related to the offense and the offender—without violating the Sixth Amendment. Because the reasoning of that line of cases addressed the intersection of Eighth Amendment considerations and Sixth Amendment jury entitlements, that line of cases provided analysis relevant to this case.

5. In response to *Miller*'s directive about individualized juvenile sentencing, the Legislature enacted MCL 769.25. MCL 769.25(2) provides that for certain enumerated homicide offenses, the prosecuting attorney may move to sentence a defendant who was less than 18 years of age at the time he or she committed the offense to life in prison without the possibility of parole. If the prosecuting attorney does not file the motion, MCL 769.25(4) and (9) require the court to sentence the juvenile to a term of years with a maximum of not more than 60 years and a minimum of not less than 25 years or more than 40 years. If the prosecuting attorney does file a motion seeking a life-without-parole sentence, however, MCL 769.25(6) requires the court to conduct a hearing on the motion as part of the sentencing process. At the hearing, the trial court must consider the factors listed in *Miller* and may consider any other criteria relevant to its decision, including the juvenile's record while incarcerated. Under MCL 769.25(7), the court must specify on the record the aggravating and mitigating circumstances considered by the court and the court's reasons supporting the sentence imposed. The court may consider evidence presented at trial together with any evidence presented at the sentencing hearing. MCL 769.25 does not violate the Sixth Amendment because it does not alter the statutory maximum sentence that may be imposed solely on the basis of the jury's verdict—life in prison without the possibility of parole—and does not make imposition of that statutory maximum sentence dependent on any particular finding of fact by the sentencing court. MCL 769.25 does not create a default sentence of a term of years in all instances; instead, the statute allows the prosecuting attorney to file a motion to seek the maximum sentence of life without the possibility of parole, and the trial court has discretion to impose a sentence up to that statutory maximum. The statute's requirements mirror that which is required by *Miller*—individualized sentencing.

6. The individualized sentencing mandate set forth in *Miller*, as incorporated by MCL 769.25, does not violate the Sixth Amendment precedent of *Apprendi* and its progeny. The MCL 769.25 sentencing scheme is different from those at issue in *Apprendi* and its progeny because it allows the prosecuting attorney to file a motion to sentence the juvenile defendant up to

the maximum penalty allowed by the jury's verdict—life in prison without the possibility of parole; it does not alter that maximum sentence if certain factors are found by the sentencing court, which was the concern in *Apprendi*. Under MCL 769.25, a judge, not a jury, must determine whether to impose a life-without-parole sentence or a term-of-years sentence. The prosecuting attorney's motion does not trigger a factual finding that may increase the maximum sentence but instead initiates the Eighth Amendment protections *Miller* demands. The sentencing court's consideration of the *Miller* factors under MCL 769.25(6) does not aggravate punishment but instead acts as a means of mitigating punishment because it acts to caution the sentencing judge against imposing the maximum punishment authorized by the jury's verdict unless the juvenile defendant is the rare individual whose crime reflects irreparable corruption. The *Miller* factors act as a means of mitigating a juvenile defendant's sentence under the MCL 769.25 sentencing scheme because it requires the sentencing court to consider those factors when deciding whether to impose a life-without-parole sentence.

7. The prior panel reached the correct conclusion in this case. Neither *Miller* nor MCL 769.25 implicates the right to a jury trial under *Apprendi* and its progeny. Rather, MCL 769.25 implements *Miller*'s Eighth Amendment protections by establishing a procedural framework for protecting a juvenile offender's Eighth Amendment rights at sentencing. MCL 769.25(6) and (7) do not require judicial fact-finding that increases the maximum penalty for juveniles convicted of certain homicide offenses. The MCL 769.25 statutory scheme does not make imposition of a life-without-parole sentence contingent on any particular finding. Under MCL 769.25, if the prosecuting attorney files the requisite motion, the maximum sentence for a juvenile offender is life without parole, and when imposing that sentence, the sentencing court is not required to find any particular fact before making that decision.

8. When sentencing a juvenile defendant on a case-by-case basis under MCL 769.25(6), a court must begin its analysis with the understanding that life without parole is appropriate only in rare cases. A sentence of life in prison without the possibility of parole violates the Eighth Amendment when a juvenile's crime reflects unfortunate yet transient immaturity instead of irreparable corruption. The sentencing court must undertake a searching inquiry into the particular juvenile, as well as the particular offense, to determine whether the juvenile is the truly rare juvenile for whom life without parole is constitutionally propor-

tionate. This approach is required because it is difficult for even a trained psychologist, let alone a sentencing court, to make a definitive determination regarding a juvenile's capacity for reform.

9. An appellate court applies a three-fold standard when reviewing a juvenile offender's sentence of life in prison without the possibility of parole: a trial court's findings of fact are reviewed for clear error, questions of law are reviewed de novo, and the trial court's ultimate decision regarding the sentence imposed is reviewed for an abuse of discretion. Imposition of a life-without-parole sentence for juveniles requires a heightened degree of appellate scrutiny when determining whether the sentence is proportionate to a particular juvenile offender. To give effect to our Supreme Court's decision regarding judicial sentencing in *People v Milbourn*, 435 Mich 630 (1990), and the United States Supreme Court's direction in *Miller*, meaningful appellate review requires the reviewing court to remain mindful that life without parole is the maximum punishment that may be imposed on a juvenile offender and that imposition of a life-without-parole sentence on a juvenile offender is inherently suspect. An appellate court must review the record with the understanding that more likely than not, the sentence is disproportionate; it may not simply rubber-stamp the trial court's sentence because that punishment is available in only the most serious and extreme circumstances. A life-without-parole sentence for a juvenile offender imposed under MCL 769.25 may constitute an abuse of the sentencing court's discretion if the court fails to consider a relevant factor that should have received significant weight, gives significant weight to an improper or irrelevant factor, or considers only appropriate factors but nevertheless commits a clear error of judgment by arriving at a sentence that lies outside the limited range of choice dictated by the facts of the case. In this case, the trial court erred as a matter of law by failing to consider the *Miller* directive regarding the rarity with which a life-without-parole sentence should be imposed. While the trial court focused on the *Miller* factors, it gave no credence to *Miller*'s warnings that a life-without-parole sentence should only be imposed on the rare juvenile offender. The court's focus on testimony by a psychologist that defendant's prognosis for change in the next five years was poor was improper because *Miller* held that a life-without-parole sentence would be proportionate for the juvenile who is irreparably corrupt and incapable of change, not one who is incapable of change within a certain number of years.

Sentence vacated and case remanded for resentencing.

BECKERING, J., joined by SHAPIRO, P.J., concurring, wrote separately to express concern that the issue before the conflict panel—whether a judge or a jury must determine whether a juvenile should be sentenced to life without parole under MCL 769.25—incorrectly presumes that it is permissible under Michigan's Constitution, Const 1963, art 1, § 16, to impose a life-without-parole sentence on a juvenile offender. If the issue were addressed, Judge BECKERING would conclude that given the inherent difficulty in reliably assessing whether a still-developing juvenile is irreparably corrupt, the case-by-case sentencing scheme set forth in MCL 769.25 is too imprecise to pass muster under the Michigan Constitution. There is increasing scientific knowledge regarding the human brain and recognition that a juvenile is different from an adult because of his or her diminished culpability and greater capacity for reform. The characteristics of youth make a determination of irreparable corruption or permanent incorrigibility difficult. Because of these characteristics, a sentencing court is to a large degree guessing whether a juvenile is capable of reform on the basis of information that is widely recognized as unreliable given the malleability of a juvenile's still-developing brain. If imposition of life-without-parole sentences is to be permitted, like in death penalty cases, when a court conducts a hearing to decide whether to sentence a juvenile defendant to life in prison without the possibility of parole, the juvenile's defense team should include two attorneys, a mitigation specialist, and an investigator to reduce the difficulties inherent in determining whether a juvenile offender is irreparably corrupt.

METER, J., joined by M. J. KELLY and RIORDAN, JJ., concurred in Parts I, II, and III of the majority opinion but would not have vacated defendant's sentence and remanded for resentencing; the sentencing procedure was constitutional, and the sentence was proportionate to the circumstances surrounding the offense and offender.

1. CONSTITUTIONAL LAW — JUVENILES — HOMICIDE — SENTENCES — LIFE WITHOUT PAROLE — CONSIDERATION OF MITIGATING FACTORS.

The Eighth Amendment allows the imposition of an individualized life-without-parole sentence in homicide cases in the rare situation of a juvenile whose crime reflects irreparable corruption; juveniles lack maturity and have an underdeveloped sense of responsibility, they are more vulnerable to negative influences and outside pressures, they have limited control over their environment, and their character is not as well-formed as that of an adult; therefore, a juvenile offender's youth and those attendant characteristics of youth, including diminished culpability and increased potential for

reform, are relevant to a court's determination of whether a particular juvenile is the rare offender whose crime reflects irreparable corruption; the Eighth Amendment requires a framework of protections to ensure that if a sentencing court imposes a life-without-parole sentence on a juvenile offender, the individualized sentence will be proportionate to the offender and the offense; the sentencing considerations required by MCL 769.25(6) are sentencing factors that mitigate punishment through consideration of the juvenile offender's age, not elements that must be found before a more severe punishment is authorized; a sentence of life in prison without the possibility of parole violates the Eighth Amendment when a juvenile's crime reflects unfortunate yet transient immaturity instead of irreparable corruption (US Const, Am VIII).

2. Constitutional Law — Juveniles — Homicide — Sentences — Life Without Parole — Judge Decides Sentence.

MCL 769.25(2) provides that for certain enumerated homicide offenses, the prosecuting attorney may move to sentence a defendant who was less than 18 years of age at the time he or she committed the offense to life in prison without the possibility of parole; if the prosecuting attorney does not file the motion, MCL 769.25(4) and (9) require the court to sentence the juvenile to a term of years with a maximum of not more than 60 years and a minimum of not less than 25 years or more than 40 years; if the prosecuting attorney does file a motion seeking a life-without-parole sentence, however, MCL 769.25(6) requires the court to conduct a hearing on the motion as part of the sentencing process; MCL 769.25 does not violate the Sixth Amendment because it does not alter the statutory maximum sentence that may be imposed solely on the basis of the jury's verdict—life in prison without the possibility of parole—and does not make imposition of that statutory maximum sentence dependent on any particular finding of fact by the sentencing court; under MCL 769.25, a judge, not a jury, must determine whether to impose a life-without-parole sentence or a term-of-years sentence.

3. Sentences — Juveniles — Homicide — Life Without Parole — Standard of Review — Proportionality — Heightened Scrutiny.

An appellate court must apply a three-fold standard when reviewing a juvenile offender's sentence of life in prison without the possibility of parole: a trial court's findings of fact are reviewed for clear error, questions of law are reviewed de novo, and the trial court's ultimate decision regarding the sentence imposed is reviewed for an abuse of discretion; imposition of a life-without-parole sentence for juveniles requires a heightened degree of

appellate scrutiny when determining whether the sentence is proportionate to a particular juvenile offender; meaningful appellate review requires the reviewing court to remain mindful that the imposition of a life-without-parole sentence on a juvenile offender is inherently suspect; an appellate court must review the record with the understanding that more likely than not, the sentence is disproportionate; it may not simply rubber-stamp the trial court's sentence because that punishment is available in only the most serious and extreme circumstances.

*Bill Schuette*, Attorney General, *Aaron D. Lindstrom*, Solicitor General, *David S. Leyton*, Prosecuting Attorney, and *Michael A. Tesner* and *Joseph F. Sawka*, Assistant Prosecuting Attorneys, for the people.

*Ronald D. Ambrose* for defendant.

Before: SHAPIRO, P.J., and MARKEY, METER, BECKERING, STEPHENS, M. J. KELLY, and RIORDAN, JJ.

BECKERING, J. Pursuant to MCR 7.215(J), this Court convened a special conflict panel to resolve the conflict between the previous opinion issued in this case in *People v Perkins*, 314 Mich App 140; 885 NW2d 900 (2016),[1] and the decision issued in *People v Skinner*, 312 Mich App 15; 877 NW2d 482 (2015). The issue involves whether a juvenile, whom the prosecution seeks to subject to a sentence of life without parole under MCL 769.25, is entitled under the Sixth Amendment of the United States Constitution to have a jury determine whether life without parole is warranted. As evidenced by the existence of this special conflict panel, we recognize that this is a difficult issue. Also not lost on this

---

[1] The instant matter involving defendant, Kenya Hyatt, was initially consolidated with Docket Nos. 323454 and 323876, but this Court has since, on its own motion, vacated its previous order consolidating the cases to allow defendant Hyatt's case to proceed on its own before this special conflict panel. *People v Perkins*, unpublished order of the Court of Appeals, entered April 26, 2016 (Docket Nos. 323454, 323876, and 325741).

panel is the understanding that juveniles who commit a heinous offense, while undoubtedly deserving of punishment, are categorically less culpable than their adult counterparts and are less deserving of the maximum punishment available under the law. As the United States Supreme Court has made unmistakably clear, it is only the truly rare juvenile who will be deserving of the harshest penalty available under the laws of this state, and a life-without-parole sentence is an unconstitutional penalty for all juveniles but those whose crimes reflect irreparable corruption. For this reason, while we conclude that a judge, not a jury, is to make this determination, the sentencing judge must honor the mandate that was made abundantly clear in *Miller v Alabama*, 567 US 460; 132 S Ct 2455; 183 L Ed 2d 407 (2012), and other recent Eighth Amendment caselaw: a sentence of life without parole is to be reserved for only the rarest of juvenile offenders so as to avoid imposing an unconstitutionally disproportionate life-without-parole sentence on a transiently immature offender. This mandate necessarily affects not only the way a trial court is to exercise its discretion when meting out punishment, but also the way an appellate court is to review a life-without-parole sentence for a juvenile offender. In short, youth matters when it comes to sentencing, and to avoid an unconstitutional sentence, our courts, at sentencing and on appeal, must carefully take this into account when going about the exceedingly difficult task of determining whether a juvenile is irreparably corrupt—meaning incapable of rehabilitation for the remainder of his or her life.

### I. FACTS

The facts of this case are fully set forth in the prior opinion and do not bear repeating, save for a few

pertinent details. Following trial, a jury convicted defendant Kenya Hyatt of first-degree felony murder, MCL 750.316(1)(b), conspiracy to commit armed robbery, MCL 750.529, armed robbery, MCL 750.529, and possession of a firearm during the commission of a felony, MCL 750.227b(1). At a sentencing hearing conducted pursuant to MCL 769.25(6), the trial court sentenced defendant, who was 17 years old at the time of the offenses, to life without the possibility of parole for the first-degree murder conviction. The prior panel reversed his sentence because the trial judge, not a jury, was the sentencer, and because it was bound to follow the decision reached by the majority in *Skinner*, 312 Mich App 15. *Perkins*, 314 Mich App at 165-179. Nevertheless, the prior panel in the instant case noted that but for *Skinner*, it would have affirmed the sentence because it concluded that a judge, not a jury, was to determine a juvenile's eligibility for a life-without-parole sentence under MCL 769.25. *Id.* Because it disagreed with *Skinner* on this point, the prior panel declared a conflict with *Skinner*, and the Court of Appeals ordered a special conflict panel convened. *People v Perkins*, unpublished order of the Court of Appeals, entered February 12, 2016 (Docket Nos. 323454, 323876, and 325741).

## II. STANDARD OF REVIEW

Resolution of the conflict in this case requires us to construe MCL 769.25 and to examine defendant's constitutional rights under the Sixth Amendment and the Eighth Amendment of the United States Constitution. We review de novo these issues of law. *People v Humphrey*, 312 Mich App 309, 314; 877 NW2d 770 (2015) (statutory construction); *People v Al-Shara*, 311 Mich App 560, 567; 876 NW2d 826 (2015) (constitutional law).

### III. ANALYSIS

As was recognized in *Skinner* and by the prior panel in this case, the instant case involves the confluence of Sixth Amendment and Eighth Amendment jurisprudence. We begin by briefly touching on the pertinent Eighth Amendment caselaw.

#### A. RECENT EIGHTH AMENDMENT CASELAW

##### 1. *MILLER v ALABAMA*

In *Miller v Alabama*, 567 US 460, 479; 132 S Ct 2455; 183 L Ed 2d 407 (2012), the United States Supreme Court considered an Eighth Amendment challenge to mandatory life-without-parole sentences for juvenile offenders in homicide cases and concluded that "[b]y making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence [life without parole], such a scheme poses too great a risk of disproportionate punishment." The Court emphasized that the unique characteristics of youth warranted treating juveniles differently from adults for purposes of sentencing. In particular, drawing on past Eighth Amendment precedent in *Roper v Simmons*, 543 US 551, 578; 125 S Ct 1183; 161 L Ed 2d 1 (2005) (imposing a categorical ban on capital punishment for all juvenile offenders), and *Graham v Florida*, 560 US 48, 82; 130 S Ct 2011; 176 L Ed 2d 825 (2010) (banning life-without-parole sentences for juveniles in nonhomicide cases), the Court noted that juveniles have "lesser culpability" and a greater capacity for reform and thus "are constitutionally different from adults for purposes of sentencing." *Miller*, 567 US at 470-471. Specifically, the Court explained that *Roper* and *Graham* recognize "three significant gaps between juveniles and adults":

First, children have a lack of maturity and an underde-
veloped sense of responsibility, leading to recklessness,
impulsivity, and heedless risk-taking. Second, children
are more vulnerable . . . to negative influences and outside
pressures, including from their family and peers; they
have limited contro[l] over their own environment and
lack the ability to extricate themselves from horrific,
crime-producing settings. And third, a child's character is
not as well formed as an adult's; his traits are less fixed
and his actions less likely to be evidence of irretrievabl[e]
deprav[ity]. [*Id.* at 471 (citations and quotation marks
omitted; alterations in original).]

In addition to noting that the characteristics of youth
warranted treating juveniles differently, the Court rec-
ognized the severity of a life-without-parole sentence for
juveniles. Particularly, the Court took notice of the idea
that the majority in *Graham* "likened life without pa-
role for juveniles to the death penalty itself . . . ." *Id.* at
470. See also *Graham*, 560 US at 69-71. The *Graham*
majority did so by noting that life without parole was
especially harsh for a juvenile offender, who will "almost
inevitably serve 'more years and a greater percentage of
his life in prison than an adult offender.'" *Miller*, 567
US at 475, quoting *Graham*, 560 US at 70. And given
that *Roper* categorically banned the death penalty for
juvenile offenders, life without parole became the "ulti-
mate penalty for juveniles . . . ." *Miller*, 567 US at 475.
Because *Graham* likened life without parole for juve-
niles to the death penalty, the Court reasoned that
*Graham* made death-penalty caselaw—which imposed
the requirement of individualized sentencing through
consideration of the offender's character and record,
along with the circumstances of the offense and other
mitigating or aggravating factors—relevant to the issue
at hand. *Id.*

In light of the characteristics of youth and pertinent

Eighth Amendment precedent, the Court concluded that mandatory life-without-parole sentencing schemes for juveniles, "by their nature, preclude a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it." *Id.* at 476. "And still worse," continued the Court, "each juvenile (including these two 14-year-olds) will receive the same sentence as the vast majority of adults committing similar homicide offenses—but really, as *Graham* noted, a *greater* sentence than those adults will serve." *Id.* at 477. Accordingly, the Court barred mandatory life-without-parole sentences for juvenile offenders in homicide cases and provided a number of nonexhaustive factors[2] that a sentencer should consider before imposing a life-without-parole sentence:

> Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. [*Id.* at 477-478.]

The Court stopped short of considering a categorical ban on life-without-parole sentences for juveniles be-

---

[2] As will be discussed, our Legislature, in MCL 769.25, dubbed these the "*Miller* factors."

cause that issue was not before it but held that the
Eighth Amendment forbids the imposition of a manda-
tory penalty because it "prevent[s] the sentencer from
taking account of" the offender's youthfulness, dimin-
ished culpability, and increased potential for reform.
*Id.* at 476. Yet, while not imposing a categorical ban,
the Court was careful to note that because of a juve-
nile's "diminished culpability and heightened capacity
for change, we think appropriate occasions for sentenc-
ing juveniles to this harshest possible penalty will be
uncommon." *Id.* at 479. "That is especially so," rea-
soned the Court, "because of the great difficulty we
noted in *Roper* and *Graham* of distinguishing at this
early age between the juvenile offender whose crime
reflects unfortunate yet transient immaturity, and the
rare juvenile offender whose crime reflects irreparable
corruption." *Id.* at 479-480 (citations and quotation
marks omitted).

### 2. *MONTGOMERY v LOUISIANA*

The first—and perhaps most pressing—issue left in
*Miller*'s wake was the issue of retroactivity. A number
of states took aim at this issue, including this Court
and the Michigan Supreme Court.[3] The United States
Supreme Court resolved this issue in *Montgomery v
Louisiana*, 577 US ___; 136 S Ct 718; 193 L Ed 2d 599
(2016), a case of which neither *Skinner* nor *Hyatt* had
the benefit. The majority ruled—in a holding that is

---

[3] See *People v Carp*, 496 Mich 440; 852 NW2d 801 (2014), vacated sub
nom *Davis v Michigan*, 577 US___; 136 S Ct 1356 (2016) (the United
States Supreme Court vacated the Michigan Supreme Court's decision
in *Carp* and remanded the case for further consideration in light of
*Montgomery v Louisiana*, 577 US ___; 136 S Ct 718; 193 L Ed 2d 599
(2016); the Michigan Supreme Court ultimately vacated the *Carp*
defendant's sentence, *People v Carp*, 499 Mich 903 (2016)).

not of particular relevance for resolving the issue in the present case—that *Miller* applied retroactively. *Id*. at ___; 136 S Ct at 736. More relevant to our discussion in the instant case was *Montgomery*'s admonition—continued from *Miller*—that "a lifetime in prison is a disproportionate sentence for all but the rarest of children, those whose crimes reflect irreparable corruption." *Id*. at ___; 136 S Ct at 726 (citation and quotation marks omitted). The Court also acknowledged, in the context of concluding that the rule in *Miller* was substantive and thus subject to retroactive application, that *Miller* did not forbid states from imposing life-without-parole sentences altogether. *Id*. at ___; 136 S Ct at 734. However, *Miller* nevertheless barred life without parole "for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility"; "[f]or that reason, *Miller* is no less substantive than are *Roper* and *Graham*." *Id*. at ___; 136 S Ct at 734.

Also relevant to our discussion, the Court in *Montgomery* acknowledged that the holding in *Miller*, while substantive, nevertheless "has a procedural component" in that it requires "a sentencer to consider a juvenile offender's youth and attendant characteristics before determining that life without parole is a proportionate sentence." *Id*. at ___; 136 S Ct at 734. This procedural component—a hearing at which " 'youth and its attendant characteristics' are considered as sentencing factors"—was necessary to give effect to *Miller*'s "substantive holding that life without parole is an excessive sentence for children whose crimes reflect transient immaturity." *Id*. at ___; 136 S Ct at 735. The Supreme Court, in rejecting an argument made in that case, acknowledged that *Miller* did not require trial courts to make findings of fact regarding a child's "incorrigibility." *Id*. at ___; 136 S Ct at 735. However,

"[t]hat *Miller* did not impose a formal factfinding requirement does not leave States free to sentence a child whose crime reflects transient immaturity to life without parole. To the contrary, *Miller* established that this punishment is disproportionate under the Eighth Amendment." *Id.* at ___; 136 S Ct at 735. In the absence of express procedural requirements or factfinding requirements set forth in *Miller*, the Court in *Montgomery* emphasized that it was incumbent on states to develop procedures to enforce *Miller*'s substantive guarantee of individualized sentencing for juvenile offenders facing the possibility of life without parole. *Id.* at ___; 136 S Ct at 735.

### B. MCL 769.25—OUR RESPONSE TO *MILLER*

In response to *Miller*'s directive about individualized sentencing, our Legislature enacted 2014 PA 22, which, in relevant part, added MCL 769.25. For certain enumerated homicide offenses, the statute allows the prosecuting attorney to "file a motion under this section to sentence" a juvenile offender "to imprisonment for life without the possibility of parole . . . ." MCL 769.25(2). With a nod toward *Miller*, the statute provides that:

> (6) If the prosecuting attorney files a motion under subsection (2), the court shall conduct a hearing on the motion as part of the sentencing process. At the hearing, the trial court shall consider the factors listed in Miller v Alabama, [567] US [460]; 183 L Ed 2d 407; 132 S Ct 2455 (2012), and may consider any other criteria relevant to its decision, including the individual's record while incarcerated.

> (7) At the hearing under subsection (6), the court shall specify on the record the aggravating and mitigating circumstances considered by the court and the court's reasons supporting the sentence imposed. The court may

consider evidence presented at trial together with any evidence presented at the sentencing hearing. [MCL 769.25.]

However, absent a motion by the prosecuting attorney seeking the penalty of life without parole, MCL 769.25(4), or "[i]f the court decides not to sentence the individual to imprisonment for life without parole eligibility, the court shall sentence the individual to a term of imprisonment for which the maximum term shall be not less than 60 years and the minimum term shall be not less than 25 years or more than 40 years," MCL 769.25(9).

### C. *APPRENDI* AND SIXTH AMENDMENT JURISPRUDENCE

#### 1. *APPRENDI*

The issue at the heart of this conflict case is whether *Miller*—and how our Legislature has chosen to implement *Miller*'s guarantee of individualized sentencing in MCL 769.25—runs afoul of Sixth Amendment caselaw concerning a defendant's right to have a jury decide those facts that increase the maximum available punishment. Neither *Miller* nor *Montgomery* had occasion to address this issue. In *People v Carp*, 496 Mich 440, 490-491, 491 n 20; 852 NW2d 801 (2014)—a pre-*Montgomery* case dealing with the retroactivity of *Miller*—our Supreme Court declined to address the issue.[4] Accordingly, we must turn our attention to pertinent Sixth Amendment caselaw.

In one of the more influential cases in this line of precedent, *Apprendi v New Jersey*, 530 US 466, 490; 120 S Ct 2348; 147 L Ed 2d 435 (2000), the United States Supreme Court held that "[o]ther than the fact

---

[4] The opinion in *Carp* was later vacated as described in note 3 of this opinion.

of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." In *Apprendi*, the defendant pleaded guilty to a weapons offense for which the prescribed penalty range was 5 to 10 years' imprisonment. *Id*. at 469-470. Subsequent to the trial court accepting the plea, the prosecutor filed a motion to extend the term of imprisonment based on a "hate crime" statute. *Id*. at 470. The trial court found that the defendant acted "with a purpose to intimidate" under the statute, which allowed the court to enhance the defendant's maximum sentence to 10-20 years' imprisonment. *Id*. at 471.

The Supreme Court agreed with the defendant's challenge to his sentence in *Apprendi*, concluding that the due-process guarantee of the Fourteenth Amendment as well as the Sixth Amendment right to a jury trial "indisputably entitle a criminal defendant to a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." *Id*. at 477 (citation and quotation marks omitted; alteration in original). Any fact, other than a prior conviction, "that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to the jury, and proved beyond a reasonable doubt." *Id*. at 490.

While the *Apprendi* Court held that elements of the offense must be submitted to the jury, it was careful to specify that the holding in that case did not suggest

that it is impermissible for judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment *within the range* prescribed by statute. We have often noted that judges in this country have long exercised discretion of

this nature in imposing sentence *within statutory limits* in the individual case. [*Id.* at 481.]

Provided that a sentencing judge operated within the limits of punishment as provided by statute and did not increase the maximum punishment, the judge properly exercised his or her sentencing authority. See *id.* at 482-483. In such an instance, any facts found functioned as mere sentencing factors, rather than elements of an aggravated offense. See *id.* at 482-483, 485-486. See also 6 LaFave et al, Criminal Procedure (4th ed), § 26.4(h), p 1007.

The *Apprendi* Court also took care to note the historical distinction in its jurisprudence "between facts in aggravation of punishment and facts in mitigation." *Apprendi*, 530 US at 490 n 16. The former requires a jury to find the fact proved beyond a reasonable doubt, while the latter does not. *Id.* As to mitigating factors, the Court explained:

> If facts found by a jury support a guilty verdict of murder, the judge is authorized by that jury verdict to sentence the defendant to the maximum sentence provided by the murder statute. If the defendant can escape the statutory maximum by showing, for example, that he is a war veteran, then a judge that finds the fact of veteran status is neither exposing the defendant to a deprivation of liberty greater than that authorized by the verdict according to statute, nor is the judge imposing upon the defendant a greater stigma than that accompanying the jury verdict alone. Core concerns animating the jury and burden-of-proof requirements are thus absent from such a scheme. [*Id.*]

### 2. EXPANSION OF *APPRENDI*

In the years since it issued *Apprendi*, the Supreme Court has expanded the territorial limits of "*Apprendi-*

land"—a term coined by Justice Scalia[5]—to include, among other matters, judicial fact-finding on the aggravating factors required for imposition of the death penalty, *Ring v Arizona*, 536 US 584, 609; 122 S Ct 2428; 153 L Ed 2d 556 (2002), judicial fact-finding that affected sentencing-guideline-range maximums, see *United States v Booker*, 543 US 220, 226-227, 244; 125 S Ct 738; 160 L Ed 2d 621 (2005); *Blakely v Washington*, 542 US 296, 305, 313; 124 S Ct 2531; 159 L Ed 2d 403 (2004), determinate sentencing tiers under which the trial judge, not the jury, was given authority to find facts that exposed a defendant to an elevated sentence, see *Cunningham v California*, 549 US 270, 274-275, 293; 127 S Ct 856; 166 L Ed 2d 856 (2007), mandatory minimum sentences, see *Alleyne v United States*, 570 US ___; 133 S Ct 2151, 2155, 2163-2164; 186 L Ed 2d 314 (2013),[6] and criminal fines, *Southern Union Co v United States*, 567 US 343, 346; 132 S Ct 2344; 183 L Ed 2d 318 (2012). In each of these cases, the Court reiterated that any fact, other than a prior conviction, that increases the penalty for a crime beyond the statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. See, e.g., *Blakely*, 542 US at 301. For purposes of *Apprendi*, this statutory maximum "is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings." *Id.* at 303-304. It does not matter for purposes of *Apprendi* whether the enhancement of the maximum sentence occurs on the basis of the finding of

---

[5] *Ring v Arizona*, 536 US 584, 613; 122 S Ct 2428; 153 L Ed 2d 556 (2002) (Scalia, J., concurring).

[6] In response to *Alleyne*, our Supreme Court struck the statutory requirement that made the use of sentencing guidelines—used to calculate a defendant's minimum sentence in Michigan—mandatory. *People v Lockridge*, 498 Mich 358, 364; 870 NW2d 502 (2015).

a single, specified fact, several specified facts, or on any aggravating fact: the Sixth Amendment violation is the same regardless. *Id*. at 305. Hence, if a statute provides for a particular term of imprisonment as well as an enhanced term, a judge cannot, when the jury's verdict only authorized the lower term, find facts that increase the maximum punishment. *Cunningham*, 549 US at 288. A defendant has the right to have a "jury find the existence of any particular fact that the law makes essential to his punishment." *Booker*, 543 US at 232 (citation and quotation marks omitted). The Court has repeatedly stressed that a "judge's authority to sentence derives wholly from the jury's verdict. Without that restriction, the jury would not exercise the control that the Framers intended." *Blakely*, 542 US at 306.

The Supreme Court's Sixth Amendment jurisprudence has emphasized that the *Apprendi* rule was not concerned with the label—element or sentencing factor—assigned to a particular factual finding. Rather, it was the *effect* of the particular finding that mattered. That is, did the fact or facts found by the sentencing judge increase the statutory maximum sentence from that which was authorized by the jury's verdict? *Booker*, 543 US at 231; *Blakely*, 542 US at 306; *Apprendi*, 530 US at 494. See also *Alleyne*, 570 US at ___; 133 S Ct at 2158 ("The touchstone for determining whether a fact must be found by a jury beyond a reasonable doubt is whether the fact constitutes an 'element' or 'ingredient' of the charged offense. . . . [A] fact is by definition an element of the offense and must be submitted to the jury if it increases the punishment above what is otherwise legally prescribed."); *Cunningham*, 549 US at 290 ("If the jury's verdict alone does not authorize the sentence, if, instead, the judge must find an additional fact to impose the longer term, the

Sixth Amendment requirement is not satisfied."). A particular fact functions as an "element" if, by law, it increases the penalty for that crime. *Alleyne*, 570 US at ___; 133 S Ct at 2155.

### 3. *HURST* AND *RING*

In addition to these extensions of *Apprendi*, we note an area of caselaw to which the parties pay particular attention in the instant case: the extension of the *Apprendi* rule to cases involving aggravating factors used to enhance a sentence for purposes of imposing the death penalty. See *Hurst v Florida*, 577 US ___; 136 S Ct 616; 193 L Ed 2d 504 (2016); *Ring*, 536 US 584. Although these cases dealt with the imposition of the death penalty on adult offenders, the sentencing schemes—and the intersection of Eighth Amendment considerations and Sixth Amendment jury entitlements at issue in both *Hurst* and *Ring*—provide useful analysis for addressing the sentencing scheme at issue in the instant case.

In *Ring*, 536 US at 589, 591, the jury convicted the defendant, Timothy Ring, of felony murder for the death of the victim during the robbery of an armored car, but deadlocked on the charge of premeditated murder. The issue in that case concerned whether the jury's verdict authorized the imposition of the death penalty under Arizona law. "Under Arizona law, [the defendant] could not be sentenced to death, the statutory maximum penalty for first-degree murder, *unless further findings were made*." *Id.* at 592 (emphasis added). In particular, Arizona's first-degree murder statute authorized the penalty of death or life imprisonment, but, for purposes of determining which penalty to impose, Arizona law directed the trial judge to "conduct a separate sentencing hearing to determine

the existence or nonexistence of [certain enumerated] circumstances . . . ." *Id.* (citation and quotation marks omitted; alteration in original). The sentencing scheme at issue provided that the trial judge was to determine whether any of the enumerated aggravating factors existed, as well as any mitigating circumstances, and that the judge could only impose the death penalty "if there is at least one aggravating circumstance and there are no mitigating circumstances sufficiently substantial to call for leniency." *Id.* at 593 (citation and quotation marks omitted).

The defendant in *Ring* contended that the Sixth Amendment required jury findings on the statutory aggravating factors. *Id.* at 597 n 4. The aggravating factors required by Arizona law were added by the state's legislature in large part due to Eighth Amendment caselaw concerning the imposition of death sentences and the requirement of aggravating factors. *Id.* at 606, citing *Maynard v Cartwright*, 486 US 356, 362; 108 S Ct 1853; 100 L Ed 2d 372 (1988); *Furman v Georgia*, 408 US 238; 92 S Ct 2726; 33 L Ed 2d 346 (1972). The Supreme Court in *Ring* remarked that the addition of aggravating factors was an "element" that was "constitutionally required" by the Eighth Amendment. *Ring*, 536 US at 606-607.

The Supreme Court found that Arizona's sentencing scheme could not be reconciled with *Apprendi* because, "[b]ased solely on the jury's verdict finding [the defendant] guilty of first-degree felony murder, the maximum punishment he could have received was life imprisonment," not death. *Id.* at 597. See also *id.* at 609 (holding that the Arizona sentencing scheme violated the Sixth Amendment because it "allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the

death penalty"). "This was so because, in Arizona, a death sentence may not legally be imposed" under state law "*unless* at least one aggravating factor is found to exist beyond a reasonable doubt." *Id.* at 597 (citation and quotation marks omitted; emphasis added). Reviewing *Apprendi,* the Court stated that the "dispositive question" was " 'one not of form, but of effect.' If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it— must be found by a jury beyond a reasonable doubt." *Id.* at 602, quoting *Apprendi,* 530 US at 494. In *Ring,* the "effect" of the statutory scheme required the finding of an aggravating fact *before* a defendant could be exposed to a greater punishment—death—than was authorized by the jury's verdict alone. *Ring,* 536 US at 604. "Because Arizona's enumerated aggravating factors operate as the functional equivalent of an element of a greater offense, the Sixth Amendment requires that they be found by a jury." *Id.* at 609 (citation and quotation marks omitted).

In *Hurst,* another case dealing with the imposition of the death penalty, the Court dealt with a variation on the issue raised in *Ring.* In that case, the defendant, Timothy Hurst, was convicted of first-degree murder. *Hurst,* 577 US at ___; 136 S Ct at 619-620. Under Florida law, the maximum sentence that could be imposed for the offense was life imprisonment. *Id.* at ___; 136 S Ct at 620. An offender could only receive a death sentence if the trial court made additional findings of fact. *Id.* at ___; 136 S Ct at 620. The Florida sentencing proceeding was a hybrid proceeding in which following an evidentiary hearing, the jury would first render an "advisory verdict" of life or death without specifying the factual basis for its recommendation. *Id.* at ___; 136 S Ct 620. Afterward, the trial judge would weigh the aggra-

vating and mitigating factors and then decide between a sentence of life imprisonment or death, regardless of the jury's recommendation. *Id*. at ___; 136 S Ct at 620. Further, "[i]f the court imposes death, it must set forth in writing its findings upon which the sentence of death is based." *Id*. at ___; 136 S Ct at 620 (citation and quotation marks omitted).

The United States Supreme Court concluded that Florida's sentencing scheme could not be reconciled with *Ring* and *Apprendi*. *Id*. at ___; 136 S Ct at 621. The Court recited its holding in *Ring* that "Arizona's capital sentencing scheme violated *Apprendi*'s rule because the State allowed a judge to find the facts necessary to sentence a defendant to death." *Id*. at ___; 136 S Ct at 621, citing *Ring*, 536 US at 591. This same analysis, the Court concluded, applied in *Hurst* and demonstrated the constitutional infirmity of the defendant's death sentence in that case. *Hurst*, 577 US at ___; 136 S Ct at 621-622. "Like Arizona at the time of *Ring*, Florida does not require the jury to make the critical findings *necessary to impose the death penalty*. Rather, Florida requires a judge to find these facts." *Id*. at ___; 136 S Ct at 622 (emphasis added). That Florida's sentencing scheme included an advisory jury verdict—a component not present in Arizona's scheme—did not change the analysis because the advisory jury did not make specific factual findings and its recommendation was not binding on the judge. *Id*. at ___; 136 S Ct at 622. The Court concluded:

> As with Timothy Ring, the maximum punishment Timothy Hurst could have received without any judge-made findings was life in prison without parole. As with Ring, a judge increased Hurst's authorized punishment based on her own factfinding. In light of *Ring*, we hold that Hurst's sentence violates the Sixth Amendment. [*Id*. at ___; 136 S Ct at 622.]

In short, the Sixth Amendment violation in *Hurst*, as in *Ring*, was that—although the statutory maximum for the homicide offense of which the defendant was convicted authorized the death penalty—a judge could only impose the death penalty on the basis of findings beyond the jury's verdict. The death penalty was not available but for judicial fact-findings regarding certain aggravating factors that had not been submitted to a jury for determination beyond a reasonable doubt.

### 4. *APPRENDI* DOES NOT BAR ALL JUDICIAL FACT-FINDING

For all that was said in *Apprendi* and its progeny, we note that the Supreme Court's holding in those cases must not be read as a prohibition against all judicial fact-finding at sentencing. Indeed, the rules from *Apprendi* and its progeny do not stand for the proposition that a sentencing scheme in which judges are permitted "genuinely to exercise broad discretion . . . *within a statutory range*" is unconstitutional; rather, as articulated in *Cunningham*, "everyone agrees" that such a scheme "encounters no Sixth Amendment shoal." *Cunningham*, 549 US at 294 (citation and quotation marks omitted; alteration in original; emphasis added). See also *Alleyne*, 570 US at ___; 133 S Ct at 2163 ("Our ruling today does not mean that any fact that influences judicial discretion must be found by a jury. We have long recognized that broad sentencing discretion, informed by judicial factfinding, does not violate the Sixth Amendment."). Therefore, a judge acting within the range of punishment authorized by statute may exercise his or her discretion—and find facts and consider factors relating to the offense and the offender—without violating the Sixth Amendment. *Id*. at ___; 136 S Ct at 2163, citing *Apprendi*, 530 US at 481. As explained in *Alleyne*, 570 US at ___; 133 S Ct at 2163:

> [W]ithin the limits of any discretion as to the
> punishment which the law may have allowed,
> the judge, when he pronounces sentence, may
> suffer his discretion to be influenced by matter
> shown in aggravation or mitigation, not cov-
> ered by the allegations of the indictment. [1 J.
> Bishop, Criminal Procedure 50 (2d ed, 1872),]
> § 85, at 54.

[E]stablishing what punishment is available by law and
setting a specific punishment within the bounds that the
law has prescribed are two different things. *Apprendi*,
[530 US] at 519, 120 S Ct 2348 (Thomas, J., concurring).
[Quotation marks omitted; first and third alteration in
original.]

### D. *SKINNER* AND *HYATT*

With that backdrop in mind, we arrive at the basis
for this conflict: *Skinner* and the prior opinion in this
case.

#### 1. *SKINNER*

This Court first encountered the issue in *Skinner*,
312 Mich App 15. In that case, the majority, after a
careful and detailed discussion of the relevant caselaw,
arrived at the conclusion that a defendant is entitled to
have a jury be the decision-maker at the so-called
*Miller* hearing required by MCL 769.25. The majority
concluded that MCL 769.25 mandated "findings" and
that those findings constituted elements of the offense.
*Skinner*, 312 Mich App at 42-43. The majority reasoned
that MCL 769.25 established a "default" sentence of a
term of years for juveniles convicted of first-degree
murder because, absent a motion by the prosecution,
the trial court was required to impose a term-of-years
sentence. *Id.* at 43-44, citing MCL 769.25(4). This
conclusion as to a "default" sentence was premised, in

part, on our Supreme Court's opinion in *Carp*, which
used the same term, "default," and concluded that
"MCL 769.25 *now establishes a default sentencing
range* for individuals who commit first-degree murder
before turning 18 years of age." *Skinner*, 312 Mich App
at 44, quoting *Carp*, 496 Mich at 458. According to the
majority in *Skinner*, MCL 769.25 conditioned a life-
without-parole sentence for a juvenile offender on two
things: (1) the filing of a motion by the prosecuting
attorney to impose the sentence and (2) the trial court's
findings on the *Miller* factors and on any other criteria
relevant to its decision. *Skinner*, 312 Mich App at 45,
citing and quoting MCL 769.25(6). This scheme, ac-
cording to the majority, authorized an *enhanced sen-
tence* on the basis of factual findings by the trial court
and ran afoul of the rule established in *Apprendi* and
its progeny. *Skinner*, 312 Mich App at 45.

> Clearly, the findings mandated by MCL 769.25(6) "ex-
> pose the defendant to a greater punishment than that
> authorized by the jury's guilty verdict," *Apprendi*, 530 US
> at 494, and therefore act as the "functional equivalent" of
> elements of a greater offense that must be proved to a jury
> beyond a reasonable doubt, *Ring*, 536 US at 609. An
> enhanced punishment under MCL 769.25 is not based
> merely on defendant's prior convictions, on facts admitted
> by defendant, or on facts that are part and parcel of the
> elements that were submitted to the jury during the guilt
> phase of the proceeding. Rather, like in *Apprendi*, 530 US
> at 476, in this case the state threatened defendant with
> certain pains—i.e., a term-of-years sentence—following
> her jury conviction of first-degree murder and with addi-
> tional pains—i.e., life without parole—following addi-
> tional findings by the trial court. "Merely using the label
> 'sentence enhancement' to describe the latter surely does
> not provide a principled basis for treating them differ-
> ently." *Id.* The effect of MCL 769.25 plainly subjects
> defendant to harsher punishment on the basis of judicially

found facts in contravention of the Sixth Amendment. [*Skinner*, 312 Mich App at 46.]

In a strong dissent, Judge SAWYER rejected the idea that MCL 769.25 required findings of fact that increased the maximum sentence authorized by statute. *Skinner*, 312 Mich App at 63-64 (SAWYER, J., dissenting). Judge SAWYER equated the requirements of MCL 769.25 to sentencing factors, rather than fact-finding that authorized the trial court to impose a greater sentence than the statutory maximum. *Id.* "[T]he juvenile lifer law does not require any particular judicial fact-finding to increase the potential sentence from a term of years to life without parole." *Id.* at 70. MCL 769.25(6), as summarized by Judge SAWYER,

> does require the trial court to conduct a hearing before it may impose a sentence of life without parole on a juvenile offender. And it further requires that the trial court "consider" the factors listed in *Miller*, as well as any other criteria the trial court deems relevant to its decision. MCL 769.25(7) then requires that "the court shall specify on the record the aggravating and mitigating circumstances considered by the court and the court's reasons supporting the sentence imposed." *But nowhere does the statute require the trial court to make any particular finding of fact before it is authorized to impose a sentence of life without parole. Rather, after conducting the hearing and considering the evidence presented at the hearing as well as the evidence presented at trial, the trial court makes its decision and must state on the record the reasons for that decision.* As our Supreme Court noted in *Carp*, this process allows for the "individualized sentencing" procedures established by *Miller*. This procedure also presumably allows for more meaningful appellate review of the sentence. [*Skinner*, 312 Mich App at 73 (SAWYER, J., dissenting) (citation omitted; emphasis added).]

Likewise, Judge SAWYER concluded that *Miller* itself did not require any particular fact to be found before a

court could impose a sentence of life without parole. *Id.* at 74. Rather, it established a framework for ensuring that juveniles would receive an individualized sentence. *Id.*

### 2. *HYATT*

In the prior appeal in the instant matter, defendant Hyatt argued that he was entitled to have a jury determine his sentence in accordance with *Skinner*. The panel recognized that it was bound by *Skinner,* but stated, "[W]e believe that *Skinner* was wrongly decided." *Perkins,* 314 Mich App at 165. Like the panel in *Skinner,* the prior panel engaged in a lengthy and detailed analysis of MCL 769.25, *Miller,* and Sixth Amendment caselaw such as *Apprendi, Ring, Booker, Blakely, Cunningham,* and *Alleyne. Id.* at 165-176. After this detailed analysis, the panel agreed with Judge SAWYER's dissent in *Skinner.* That is, the prior panel believed that MCL 769.25 "does not run afoul of [Sixth Amendment jurisprudence] because Hyatt did not receive an enhanced sentence. The sentencing court did not determine facts not already determined by the jury's verdict." *Id.* at 176. Moreover, unlike in *Apprendi, Ring, Blakely, Cunningham,* and *Alleyne,* "nothing in MCL 769.25 premised a sentencing court's authority to impose a term of life imprisonment without parole on any specific finding that Hyatt's jury failed to consider in convicting Hyatt of first-degree felony murder. Because the prosecutor undisputedly and properly filed a motion seeking a life-without-parole sentence for Hyatt, the mandates in §§ 25(4) and (9) regarding the term of years did not apply." *Id.* at 177-178. Finally, the panel reasoned, "[T]he plain language of the statute did not require the trial court to make any findings concerning aggravating or miti-

gating factors before the court could sentence Hyatt to life without parole. Consequently, the life-without-parole sentence in this case came within the statutory maximum . . . ." *Id.* at 178.

The prior panel remanded the matter for resentencing, but stated that, "[w]ere it not for *Skinner,* we would affirm the sentencing court's decision to sentence Hyatt to life imprisonment without the possibility of parole." *Id.* at 179.

### E. RESOLUTION OF THE CONFLICT

We hold that the prior panel's analysis in this case was correct. Neither *Miller* nor MCL 769.25 implicates the right to a jury trial under *Apprendi* and its progeny. Rather, by implementing *Miller*'s Eighth Amendment protections through its enactment of MCL 769.25, the Legislature simply established a procedural framework for protecting a juvenile's Eighth Amendment rights at sentencing. The sentencing procedure at issue in this case does not involve the concern that was at issue in *Apprendi,* 530 US at 490—fact-finding that increases the maximum penalty for juvenile homicide offenders. In other words, the instant case is not one in which the finding of a particular fact increases the maximum penalty. Nor does the instant case involve a statutory scheme that makes the imposition of life without parole contingent on any particular finding. Under MCL 769.25, the statutory maximum for juvenile offenders—assuming the requisite motion has been filed—is a life-without-parole sentence, and when imposing that rare sentence, the sentencing authority is not tasked with finding any particular fact before making its decision. A careful examination of both *Miller* and MCL 769.25 compels this result.

At the outset, we reject arguments that the Supreme Court's decision in *Miller* can be read to implicate the Sixth Amendment; we also reject the idea that the decision in *Miller* suggests the right to have a jury determination on the sentence of life without parole. In this respect, it is important to note the Court's concern in *Miller*: the imposition of a disproportionate sentence on juvenile offenders. The risk of a disproportionate sentence was, for purposes of the Eighth Amendment, unacceptable under a system of mandatory life-without-parole sentences for certain homicide offenses. *Miller*, 567 US at 479 ("By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment."). To alleviate this concern, the Court created a framework for protecting a juvenile's Eighth Amendment right against disproportionate punishment. Important to our present case, this framework does not make the imposition of a life-without-parole sentence contingent upon the finding of a certain fact. The Court's decision in *Miller* did not require a sentencing authority to consider an offender's youth before *aggravating* the available penalty. Rather, the Court imposed an individualized sentencing mandate for juvenile offenders convicted of homicide offenses. Individualized sentencing was required to ensure proportionality, not to aggravate the maximum penalty available under the law. Hence, a sentencing authority remains free under *Miller* to impose a life-without-parole sentence based solely on the jury's verdict. *Miller* simply holds that a framework of protections required by the Eighth Amendment must be implemented to ensure that the imposition of the maximum available penalty—life without parole—is proportionate to the particular offender and the particular of-

fense. In short, the remodeling that *Miller* performed on life-without-parole sentences for juveniles did not touch the ceiling—or floor, for that matter—of the available sentence for juvenile homicide offenders.

In support of our interpretation of *Miller*'s demands, we note the Supreme Court's discussion of *Miller* in *Montgomery*.[7] Notably, in *Montgomery*, 577 US at ___; 136 S Ct at 735, albeit not within the context of a Sixth Amendment discussion, the Supreme Court expressly recognized that its decision in *Miller* did not require a sentencing authority to make a finding of fact on a child's incorrigibility before imposing a life-without-parole sentence. As stated in *Montgomery*, "[t]hat *Miller* did not impose a formal factfinding requirement [regarding incorrigibility] does not leave States free to sentence a child whose crime reflects transient immaturity to life without parole. To the contrary, *Miller* established that this punishment is disproportionate under the Eighth Amendment." *Id.* at ___; 136 S Ct at 735. In accordance with *Montgomery*'s conclusion about *Miller*'s demands, we decline to conclude that *Miller* implicates a defendant's Sixth Amendment right to a jury trial.[8]

---

[7] Again, neither the panel in *Skinner* nor the prior panel in this case had the benefit of the *Montgomery* analysis.

[8] Although they are not binding on this Court, we note that two of the only cases to consider this issue in another state reached the same result regarding whether *Miller* requires a jury determination. See *State v Fletcher*, 149 So 3d 934, 943; La App 49, 303 (2d Cir, October 1, 2014); *People v Gutierrez*, unpublished opinion of the California Court of Appeal, issued June 22, 2016 (Docket No. B261989), pp 6-7. Notably, in *Fletcher*, 149 So 3d at 943, the Louisiana Court of Appeals rejected the idea that *Miller* created a "new statutory maximum" for purposes of *Apprendi*; further, *Fletcher* rejected the idea that *Miller* required proof of an additional element before a sentencing authority could impose a life-without-parole sentence. Rather, reasoned the court in *Fletcher*, *Miller* "merely mandates a hearing at which youth-related mitigating

This is not to say that the sentencing procedure envisioned by *Miller* does not involve *any* fact-finding.[9] However, the procedure described by *Miller* is missing key components for purposes of *Apprendi* and its progeny: nowhere in *Miller*'s individualized sentencing mandate is the idea that *Miller* altered the maximum punishment available for juvenile offenders or made the imposition of any punishment contingent on fact-finding. In other words, the Court did not hold that a life-without-parole sentence was unavailable *unless* the sentencing authority found certain facts. In this sense, *Miller* did not impose any aggravating factors such as those that were at issue in *Ring*, 536 US at 591-592; in that case, Arizona law provided that a jury's verdict alone was insufficient to authorize capital punishment and a death sentence required additional findings on certain aggravating factors. In contrast, *Miller* merely provided certain considerations that must be taken into account by a sentencing authority when imposing the maximum sentence—life without parole—in order to protect a juvenile's Eighth Amendment right against a disproportionate, nonindividualized sentence. *Miller*, 567 US at 477, 480-481.

---

factors can be presented to the sentencer and considered in making a determination of whether the life sentence imposed upon a juvenile killer should be with or without parole eligibility." *Id.*

[9] For instance, *Miller* requires a hearing at which a court may receive evidence about, among other matters, the circumstances of the homicide, including the juvenile's role in the offense. *Miller*, 567 US at 475-476, 480. The hearing will almost inevitably produce conflicting evidence about the extent of the offender's role, with the prosecution likely seeking to maximize the juvenile defendant's involvement in the homicide and the juvenile defendant seeking to minimize that role. Faced with conflicting evidence, a sentencing judge tasked with weighing the juvenile's role in the offense will necessarily have to make a determination about which evidence to believe, i.e., make a factual finding.

Hence, *Miller* does not implicate the type of fact-finding prohibited by *Apprendi*. The process described in *Miller* was merely a means of ensuring that the maximum sentence available under the law—life without parole—was proportionate to *the particular juvenile offender* at issue. The considerations required by *Miller*'s individualized sentencing guarantee are sentencing factors, not elements that must be found before a more severe punishment is authorized. See *Apprendi*, 530 US at 482-483, 485-486. As succinctly stated in *Alleyne*, 570 US at ___; 133 S Ct at 2163, Sixth Amendment jurisprudence has "recognized that broad sentencing discretion, informed by judicial fact-finding, does not violate the Sixth Amendment."[10]

However, the conclusion that *Miller* does not require certain factual findings in order to impose a sentence of life without parole on a juvenile offender is not, by itself, dispositive of the issue raised. As the Supreme Court in *Montgomery* acknowledged, the implementation of *Miller*'s directives was a matter left largely to the states. *Montgomery*, 577 US at ___; 136 US at 735. We now turn to the legislative response at issue in this case, MCL 769.25, to determine if the right to a jury determination can be found therein.

Careful examination of MCL 769.25 reveals that our Legislature did not alter the statutory maximum sen-

---

[10] We briefly note Justice Breyer's concurring opinion in *Miller*, in which he concluded that in order to impose a life-without-parole sentence on a juvenile offender, there must be a finding that the offender killed or intended to kill. *Miller*, 567 US 489-490 (Breyer, J., concurring). A life-without-parole sentence should be, according to Justice Breyer, "forbid[den]" without such a finding. *Id.* at 490. If this view were the current state of the law, it might change our Sixth Amendment analysis, particularly in this case, which involved felony murder in a multiple-offender situation. However, Justice Breyer's view was not adopted by the majority in *Miller*, and we see no Sixth Amendment implications in the majority's decision in *Miller*.

tence that may be imposed solely on the basis of the jury's verdict, nor did our Legislature make imposition of the statutory maximum dependent on any particular finding of fact. The statute provides that in order to sentence a juvenile defendant to life without parole, the prosecuting attorney must, in a case involving an enumerated homicide offense, file a motion seeking that sentence within the specified period. MCL 769.25(2) and (3). If the prosecuting attorney files this motion, the trial court "shall conduct a hearing on the motion as part of the sentencing process." MCL 769.25(6). At the hearing, the trial court is to consider "the factors listed in <u>Miller</u> v <u>Alabama</u> . . . and may consider any other criteria relevant to its decision, including the individual's record while incarcerated." MCL 769.25(6). Then, in what would appear to be an effort to aid appellate review of the sentence, the trial court "shall specify on the record the aggravating and mitigating circumstances considered by the court and the court's reasons supporting the sentence imposed. The court may consider evidence presented at trial together with any evidence presented at the sentencing hearing." MCL 769.25(7).

In sum, MCL 769.25 does two important things. As an initial matter, the statute plainly states that the statutory maximum for the enumerated homicide offenses—in the event the prosecution files the requisite motion—is life without parole. Any contention that MCL 769.25 creates a "default"[11] sentence of a term of years in all instances ignores the plain language of the

---

[11] The suggestion that our Supreme Court declared in *Carp*, 496 Mich at 458, that MCL 769.25 created a "default" sentence of a term of years in all instances is inaccurate. Although *Carp* mentioned a default sentence, it did so in describing the procedure for sentencing a juvenile *in the absence of a motion filed by the prosecution* seeking a life-without-parole sentence. *Id.*

statute. MCL 769.25(2) plainly permits the prosecuting attorney to seek life without parole upon the filing of the requisite motion. Once this motion is filed, the statutory maximum is life without parole, and the trial court has discretion to sentence up to that statutory maximum.

This leads to our second point. MCL 769.25 does not make the imposition of this statutory maximum contingent on any particular fact. Rather, the statute mirrors the requirement of *Miller*—individualized sentencing. That is, MCL 769.25 does away with mandatory life-without-parole sentences and requires the trial court, when the maximum sentence is sought, to make the individualized sentencing determination required by *Miller*. If, consistently with *Miller*'s demands, the sentencing judge deems life without parole to be appropriate—meaning that the case before it is one of the rare cases described by *Miller*—the trial court is authorized by the jury's verdict to impose a life-without-parole sentence. Indeed, as is the case with *Miller*, our statutory scheme does not *require* any additional findings before the imposition of a life-without-parole sentence. The sentencing judge decides whether to exercise his or her discretion to impose that statutory maximum by considering the so-called *Miller* factors to satisfy *Miller*'s individualized sentencing mandate. In sum, when the prosecuting attorney files the requisite motion, the " 'statutory maximum' for *Apprendi* purposes," see *Blakely*, 542 US at 303, is life without parole. This sentence, then, is permitted *"solely on the basis of the facts reflected in the jury verdict . . . ." Id.* This type of sentencing scheme does not run afoul of *Apprendi* and its progeny.

In this sense, the sentencing scheme imposed by MCL 769.25 is different from the schemes at issue in

*Apprendi, Blakely, Booker,* and *Cunningham*—and that difference is of critical importance for purposes of the Sixth Amendment inquiry. In particular, we note that in *Apprendi,* 530 US at 470, an enhanced sentence was possible if the prosecution filed a motion seeking such a sentence and after a hearing the trial judge found that the defendant acted with a biased purpose—which was a fact not encompassed by the jury's verdict. In this case, by contrast, MCL 769.25 allows the prosecuting attorney to file a motion to sentence up to the maximum *that is allowed by the jury's verdict.* The prosecuting attorney's motion in the instant case is not meant to trigger a factual finding that will increase the maximum sentence; instead, the motion is filed to initiate the Eighth Amendment protections demanded by *Miller.*

It is argued that a sentencing judge will necessarily engage in fact-finding during the *Miller* analysis. On this point, we agree. However, as noted, it is not dispositive that a sentencing judge makes factual findings. The dispositive question is whether the statute authorizes *increased punishment,* contingent on certain factual findings. *Ring,* 536 US at 602. Indeed, "[a] statutory requirement that a judge make findings . . . does not mean that any specific finding is necessary for imposition of the sentence." *State v Fell,* 210 Ariz 554, 559; 115 P3d 594 (2005).[12] MCL 769.25 does not authorize increased punishment, much less make such an increase contingent on any facts. Instead, the fact-finding that will inevitably occur during the *Miller* analysis is the kind that "everyone agrees encounters no Sixth Amendment shoal." *Cunningham,* 549 US at

---

[12] Although decisions from other states are not binding, we may consider them as persuasive authority. *People v Jackson,* 292 Mich App 583, 595 n 3; 808 NW2d 541 (2011).

294 (citation and quotation marks omitted). See also *Alleyne*, 570 US at ___; 133 S Ct at 2163 ("Our ruling today does not mean that any fact that influences judicial discretion must be found by a jury. We have long recognized that broad sentencing discretion, informed by judicial factfinding, does not violate the Sixth Amendment."). Any fact-finding that occurs "do[es] not pertain to whether the defendant has a legal *right* to a lesser sentence—and that makes all the difference insofar as judicial impingement upon the traditional role of the jury is concerned." *Blakely*, 542 US at 309.

For comparison purposes, we examine the sentencing of criminal defendants by federal district courts and note the type of judicial fact-finding that occurs under the sentencing factors listed in 18 USC 3553(a).[13] Any fact-finding that occurs with regard to the statutory factors is meant "to inform individual sentencing decisions and to help meet the Sentencing Commission's twin-goals of sentencing—uniformity

---

[13] Pursuant to 18 USC 3553(a):

[t]he court, in determining the particular sentence to be imposed, shall consider—

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

and proportionality," and does not affect the maximum sentence that may be imposed. *United States v Ali*, 508 F3d 136, 146 n 15 (CA 3, 2007) (citation and quotation marks omitted). Like the federal sentencing guidelines post-*Booker*, there is no mandatory or default sentence under MCL 769.25 that must be imposed *unless* the sentencing judge finds facts that the jury never found nor were admitted by the defendant. As noted by the United States Supreme Court in *Rita v United States*, 551 US 338, 352; 127 S Ct 2456; 168 L Ed 2d 203 (2007), "[t]his Court's Sixth Amendment cases do not automatically forbid a sentencing court to take account of factual matters not determined by a jury and to increase the sentence in consequence." Rather, "[t]he Sixth Amendment question" concerns "whether the law *forbids* a judge to increase a defendant's sentence *unless* the judge finds facts that the jury did not find (and the offender did not concede)." *Id.*

We also reject any argument that MCL 769.25 is comparable to the sentencing scheme that was at issue in *Ring*, 536 US 584, a case cited frequently by the parties. In *Ring*, the statutory scheme provided that the maximum penalty was death or life imprisonment, but it *conditioned* imposition of the death penalty, which represented an increase in the authorized punishment, on further factual findings by the trial judge during a separate sentencing hearing. *Id.* at 592. Those additional findings concerned aggravating and mitigating circumstances. *Id.* at 592-593. In the instant case, it is true that MCL 769.25(7) uses the term "aggravating and mitigating circumstances." The key difference, once again, is that MCL 769.25 does not make the imposition of life without parole contingent upon certain findings. MCL 769.25 only requires that which *Miller* requires—individualized sentencing based on the so-called *Miller* factors. The juvenile

defendant is—based solely on the jury's verdict and the prosecuting attorney's motion—eligible for a life-without-parole sentence, the statutory maximum.

In sum, all that is mandated by MCL 769.25 is the individualized sentencing required, as stated in *Miller*, by the Eighth Amendment. The analysis involving the *Miller* factors does not aggravate punishment; instead, the analysis acts as a means of *mitigating* punishment because it acts to caution the sentencing judge against imposing the maximum punishment authorized by the jury's verdict, a sentence which *Montgomery* cautioned is disproportionate for "the vast majority of juvenile offenders . . . ." *Montgomery*, 577 US at ___; 136 S Ct at 736. In fact, unless the defendant is the rare juvenile deserving of the harshest penalty, the *Miller* analysis, as incorporated by MCL 769.25, will have the effect of mitigating the available punishment.

The idea that *Miller*—and MCL 769.25 by its incorporation of the "*Miller* factors"—sets forth a framework of mitigation, rather than aggravation, is apparent from the text of the *Miller* decision itself. See *Miller*, 567 US at 489 ("[O]ur individualized sentencing decisions make clear that a judge or jury[14] *must have the opportunity to consider mitigating circumstances* before imposing the harshest possible penalty for juveniles.") (emphasis added). Indeed, the Supreme Court's decision in *Miller* is rife with arguments concerning why juveniles are consti-

---

[14] As aptly noted by the panel in *Skinner*, 312 Mich App at 33, the "passing reference to 'a judge or jury' " in *Miller* is hardly illuminating with regard to the issue at hand. The issue before the Court in *Miller* was limited to Eighth Amendment concerns, and the Court was not called on to weigh in on the matter now before us. Hence, like the panel in *Skinner*—and, for that matter, our Supreme Court in *Carp*, 496 Mich at 491 n 20—we assign no significance to the phrase "judge or jury" as it is used in *Miller*.

tutionally different from adults and why these differences *diminish the culpability* of juveniles. See, e.g., *id.* at 471 (explaining that juveniles are "constitutionally different from adults for purposes of sentencing" because, among other reasons, they have "diminished culpability"). The problem with a mandatory life-without-parole sentence, according to *Miller*, was that it failed to give the sentencing authority "the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles" and that such a mandatory sentencing scheme violated the principle of proportionality by forcing the sentencing authority to ignore "age and age-related characteristics," i.e., those characteristics that diminish the culpability of the juvenile, thereby warranting a lesser sentence. *Id.* at 489. The Court in *Miller* specifically invoked the "mitigating qualities of youth" in explaining why individualized sentencing was necessary when deciding whether to impose the harshest possible penalty available for juveniles—life without parole. *Id.* at 476 (citation and quotation marks omitted). This culminated in the Court announcing the so-called *Miller* factors, all of which speak to *mitigation* and why "chronological age and its hallmark features" should be considered when sentencing a juvenile. *Id.* at 477. Put simply, *Miller* required individualized sentencing as a means of mitigating the maximum penalty authorized by the jury's verdict, rather than aggravating the penalty beyond that which was set forth by law.[15] So, too, MCL 769.25 sets a maximum punishment—in the event the

---

[15] To be sure, however, *Miller* made clear that mitigation was more often than not the appropriate route, emphasizing that a life-without-parole sentence would be proportionate for only the rare juvenile "whose crime reflects irreparable corruption." *Miller*, 567 US at 479-480 (citation and quotation marks omitted).

prosecution files the requisite motion—at life without parole and mandates that the sentencing judge consider the *Miller* factors in a way that mitigates, rather than enhances, the maximum available penalty.

Viewing the *Miller* factors as a means of mitigation is not to suggest, however, that life without parole remains the default sentence for juveniles convicted of first-degree murder after *Miller*. Indeed, it is doubtful whether that result could be squared with *Miller*'s conclusions about the constitutional infirmities inherent in a mandatory life-without-parole sentencing scheme for juveniles. Instead, the *Miller* factors act as a means of mitigation in the sense that they must be considered by the sentencing judge when he or she is determining whether life without parole is an appropriate sentence to impose.

Our decision today comports with those of numerous state and lower federal courts that have considered, albeit in slightly different contexts, the intersection of the Eighth Amendment's proportionality requirements and the Sixth Amendment right to a jury trial. The cases from which we draw support stemmed from the United States Supreme Court's decisions in *Atkins v Virginia*, 536 US 304, 321; 122 S Ct 2242; 153 L Ed 2d 335 (2002)—concluding that the Eighth Amendment barred the imposition of capital punishment on defendants who are intellectually disabled, and *Tison v Arizona*, 481 US 137, 158; 107 S Ct 1676; 95 L Ed 2d 127 (1987)—banning the imposition of the death penalty in felony-murder cases unless the defendant: (1) was a major participant in the offense or (2) acted with at least a reckless indifference to human life. The consensus in these cases is that when the Eighth Amendment's proportionality requirement has barred

imposition of the death penalty because of a certain
factor or factors that suggested diminished culpability,
the determination of whether those certain factors
exist is not one that is subject to a jury determination.
Stated differently, the Eighth Amendment prohibitions
are considered to be mitigating factors that act as a bar
against imposing the statutory maximum penalty,
rather than as elements that enhance the maximum
possible penalty, and the determination of whether
those mitigating factors exist need not, under *Apprendi* and its progeny, be made by a jury. See, e.g.,
*State v Agee*, 358 Or 325, 364; 364 P3d 971 (2015)
(holding that a determination on intellectual disability
is a mitigating factor that can be made by a judge and
does not, under *Apprendi* and *Ring*, require a jury
determination); *State v Hill*, 2008 Ohio 3509, ¶ 68; 177
Ohio App 3d 171, 187; 894 NE2d 108 (Ohio App, 2008)
(rejecting the idea that the Eighth Amendment's prohibition against imposing the death penalty on an
intellectually disabled adult required a jury determination of intellectual disability because that determination mitigated, rather than enhanced, the available
punishment); *Commonwealth v Bracey*, 604 Pa 459,
473-474; 986 A2d 128 (2009) (finding that there was no
right to a jury trial on an *Atkins* claim under *Ring*);
*State v Galindo*, 278 Neb 599, 655; 774 NW2d 190
(2009) (rejecting the idea that *Tison* findings were
"elements" of the offense even when the death penalty
was imposed); *State v Nichols*, 219 Ariz 170, 172; 195
P3d 207 (2008) (recognizing that the Sixth Amendment
does not require a jury to make *Tison* findings, but a
state statutory scheme could require as much if the
legislature so chose); *State v Johnson*, 244 SW3d 144,
151 (Mo, 2008) (holding that a finding of intellectual
disability removed the defendant from consideration
for the death penalty and was therefore not the equiva-

lent of an aggravating factor that required a jury determination under *Ring*); *State v Grell*, 212 Ariz 516, 526-527; 135 P3d 696 (2006) (discussing mitigating factors from *Atkins* and *Tison* and concluding that there is no right to a jury trial on either set of factors under *Apprendi* and its progeny); *Head v Hill*, 277 Ga 255, 258; 587 SE2d 613 (2003) (opining that because intellectual disability was an "exemption" from the death penalty, it was a mitigating factor and not "the functional equivalent of an element" of the offense); *In re Johnson*, 334 F3d 403, 405 (CA 5, 2003) (stressing that a mitigating analysis of intellectual disability—required by the Eighth Amendment, per *Atkins*—was not the functional equivalent of an element of a greater offense). See also LaFave, § 26.4(i), pp 1018-1019 ("So far, lower courts have rejected arguments to equate the factors which as a matter of Eighth Amendment law are required for death eligibility with elements. The rules in *Tison* and *Atkins* have instead been treated as defenses to, not elements of, capital murder.").[16]

---

[16] The United States Supreme Court has denied leave in some of these cases, see, e.g., *Galindo v Nebraska*, 559 US 1010 (2010), but has yet to expressly weigh in on this issue post-*Apprendi*. With regard to the *Atkins* line of cases, the United States Supreme Court in *Schriro v Smith*, 546 US 6, 7; 126 S Ct 7; 163 L Ed 2d 6 (2005), left to the states to determine how to implement *Atkins* and to decide whether a judge or jury should assess the mitigating factor of intellectual disability. We also note that with regard to the offender's role in the offense, the Supreme Court in *Cabana v Bullock*, 474 US 376; 106 S Ct 689; 88 L Ed 2d 704 (1986), abrogated in part on other grounds by *Pope v Illinois*, 481 US 497, 503 n 7; 107 S Ct 1918; 95 L Ed 2d 439 (1987), discussed *Enmund v Florida*, 458 US 782; 102 S Ct 3368; 73 L Ed 2d 1140 (1982), a case which served as a precursor to *Tison* and which drew similar conclusions about the Eighth Amendment's concern with the offender's role in a capital offense. Pertinent to our discussion, the Supreme Court in *Cabana* held that the offender's role in the offense did not concern guilt or innocence and did not establish an element of capital murder that had to be found by a jury. *Cabana*, 474 US at 385. Rather, determination of the offender's role was a consideration of proportionality for purposes of

These cases are instructive in the instant case. Although the Court's holding in *Miller* did not produce an outright ban on the imposition of life-without-parole sentences for juvenile homicide offenders, it nevertheless declared that in the vast majority of cases, that sentence will be disproportionate under the Eighth Amendment. Similar to the proportionality analysis of *Atkins* and *Tison*, the Supreme Court in *Miller* concluded that a certain characteristic of the offender rendered the maximum punishment authorized by statute to be disproportionate because that characteristic suggested diminished culpability on the part of the offender. And as in *Atkins* and *Tison*, the Supreme Court in *Miller* recognized that the Eighth Amendment required a certain framework of protections be considered before the maximum punishment authorized by statute could be imposed. Thus, the decision in *Miller* demonstrates that a juvenile offender's age is a mitigating factor that is to be considered in rendering a proportionate sentence for a juvenile who is convicted of first-degree murder.[17] Our Legislature enacted MCL 769.25 in a way that essentially mirrored that which is required by *Miller*. Consideration of the *Miller* factors

the Eighth Amendment and was not a decision that required a jury determination. *Id.* Accordingly, to the extent the Supreme Court has addressed this issue, it has determined that a finding on mitigating factors does not implicate the right to a jury trial. However, before we place too much stock in *Cabana*, we must note that the case was decided prior to *Apprendi*. Accordingly, we place greater emphasis on the state court and lower federal court decisions already discussed in this opinion.

[17] Accordingly, we caution that if the prosecuting attorney moves for a life-without-parole sentence under MCL 769.25(2), the resultant *Miller* hearing must not be treated as a perfunctory exercise that will automatically authorize the imposition of a life-without-parole sentence. That approach would defy those principles that were first announced in *Miller* and that were made even clearer in *Montgomery*: life without parole is to be imposed on juvenile offenders in only the rarest of cases.

under MCL 769.25 acts to mitigate punishment, rather than acting as the functional equivalent of an element of a greater offense.

### F. CONCLUSION

In sum, we find that *Miller*'s individualized sentencing mandate, as incorporated by MCL 769.25, does not run afoul of Sixth Amendment precedent. A judge, not a jury, must determine whether to impose a life-without-parole sentence or a term-of-years sentence under MCL 769.25. Accordingly, we reject the result reached in *Skinner* and conclude that the prior panel in this case was correct in its analysis.

### IV. APPLICATION TO THIS CASE

As for the outcome of the case before us, the prosecution asks that we do two things: (1) affirm the life-without-parole sentence imposed on defendant Hyatt and (2) articulate the appropriate standard of review on appeal for a juvenile life-without-parole sentence. In addressing these issues, we find it necessary to adhere to and incorporate *Miller*'s and *Montgomery*'s oft-repeated warnings about how rarely life-without-parole sentences for juvenile offenders will be proportionate.

### A. THE TRULY RARE JUVENILE

As noted, *Miller* stopped shy of—and did not expressly consider—imposing a categorical ban on life-without-parole sentences for juveniles, but the Supreme Court repeatedly admonished sentencing authorities to impose the penalty of life without parole in only the rarest of circumstances, given the many mitigating factors of youth. In this regard, we note the

concerns raised in *Miller*—and in *Roper* and *Graham*
for that matter—concerning how juveniles are differ-
ent from adults in terms of their culpability and
capacity for change. Notably, these cases underscored
that juveniles tend to be less mature than adults, are
more likely to possess an "underdeveloped sense of
responsibility," and are more likely to engage in reck-
less behavior. *Roper*, 543 US at 569 (citation and
quotation marks omitted). Largely for these reasons,
states almost universally prohibit juveniles from mak-
ing many decisions that will have long-term effects
such as "voting, serving on juries, or marrying without
parental consent." *Id.*

In addition, juveniles "are more vulnerable or sus-
ceptible to negative influences and outside pressures,
including peer pressure." *Id.* Children also "have
limited control over their own environment and lack
the ability to extricate themselves from horrific,
crime-producing settings." *Miller*, 567 US at 471
(citations, quotation marks, and alteration omitted).
And juveniles have a lesser-defined sense of character
than the typical adult; a juvenile's "personality
traits . . . are more transitory, less fixed." *Roper*, 543
US at 570. Juveniles, noted the Court in *Graham*,
"are more capable of change than are adults, and their
actions are less likely to be evidence of irretrievably
depraved character than are the actions of adults."
*Graham*, 560 US at 68 (citation and quotation marks
omitted). In *Graham*, the Court explained that stud-
ies have demonstrated that "parts of the brain in-
volved in behavior control continue to mature through
late adolescence." *Id.* Hence, "youth is more than a
chronological fact," and "its signature qualities are all
transient." *Miller*, 567 US at 476 (citations and quo-
tation marks omitted).

The Court explained in *Roper*, 543 US at 570, that for all these reasons, "[f]rom a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed." "[T]he distinctive attributes of youth" reasoned the Court in *Miller*, 567 US at 472, "diminish the penological justifications for imposing the harshest sentence on juvenile offenders, even when they commit terrible crimes." Therefore, when it comes to sentencing a juvenile, concern must be given to the offender's youth and its attendant characteristics. This was the impetus for *Miller*'s individualized sentencing mandate. See *id.* at 473 (emphasizing that "youth matters in determining the appropriateness of a lifetime of incarceration without the possibility of parole"), and *id.* at 474 ("By removing youth from the balance—by subjecting a juvenile to the same life-without-parole sentence applicable to an adult—[mandatory sentencing schemes] prohibit a sentencing authority from assessing whether the law's harshest term of imprisonment proportionately punishes a juvenile offender."). However, this is not to say that a juvenile should not face consequences for his or her actions; rather, in rendering punishment, consideration must be given to the fact that juvenile offenders are generally less culpable than their adult counterparts. *Graham*, 560 US at 68.

Because juveniles are different from adults and have still-evolving characters, the Supreme Court has noted how difficult it can be for a sentencer to conclude that life without parole, the harshest possible penalty for a juvenile homicide offender, is proportionate to a particular offense and offender. In *Roper*, 543 US at 569, the Court recognized that "general differences" between juveniles and adults "demonstrate that juvenile

offenders *cannot with reliability be classified among the worst offenders*." (Emphasis added.) The *Roper* Court, citing Steinberg & Scott, *Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty*, 58 Am Psychologist 1009, 1014-1016 (2003), also remarked that "[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Roper*, 543 US at 573. If this determination is difficult for even trained psychologists, we would be remiss if we did not acknowledge our concerns about sentencing courts—or reviewing courts, for that matter—accurately assessing, or in essence forecasting, whether an individual who committed a crime while still a minor is and will remain irreparably corrupt for the rest of his or her life and on the basis of that assessment accurately meting out a proportionate sentence.

These concerns led the Court in *Miller* to caution that "given all we have said in *Roper, Graham,* and this decision about children's diminished culpability and heightened capacity for change, *we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon.*" *Miller*, 567 US at 479 (emphasis added). The Court returned in *Montgomery* to the idea of the infrequency of proportionate life-without-parole sentences for juvenile offenders when it declared that "[a]lthough *Miller* did not foreclose a sentencer's ability to impose life without parole on a juvenile, the Court explained that a lifetime in prison *is a disproportionate sentence for all but the rarest of children,* those whose crimes reflect irreparable corruption." *Montgomery*, 577 US at ___; 136 S Ct at 726 (citation and quotation marks omitted;

emphasis added). In fact, the majority opinion in
*Montgomery* used the words "rare" or "rarest" six times
in describing when a life-without-parole sentence
would be appropriate after *Miller*. See *id*. at ___; 136 S
Ct at 726 (declaring life without parole to be dispro-
portionate "for all but the rarest of children") (citation
and quotation marks omitted); *id*. at ___; 136 S Ct at
733 (emphasizing that although "a sentencer might
encounter the rare juvenile offender who exhibits such
irretrievable depravity that rehabilitation is impos-
sible and life without parole is justified," a life-without-
parole sentence will by and large be disproportionate);
*id*. at ___; 136 S Ct at 734 (stating that *"Miller*
determined that sentencing a child to life without
parole is excessive for all but the rare juvenile offender
whose crime reflects irreparable corruption," explain-
ing that *Miller* declared a life-without-parole sentence
to be unconstitutional "for all but the rarest of juvenile
offenders," stating that "[a]fter *Miller*, it will be the
rare juvenile offender who can receive that same
sentence," and noting that *Miller* "drew a line between
children whose crimes reflect transient immaturity
and those rare children whose crimes reflect irrepa-
rable corruption") (citation and quotation marks omit-
ted).

### B. IMPLEMENTING *MILLER* AT SENTENCING

The cautionary language employed by the Court in
*Roper, Graham, Miller*, and *Montgomery* must be hon-
ored by this Court. In light of this language and our
need to review defendant Hyatt's sentence under
*Miller*, we conclude that when sentencing a juvenile
offender, a trial court must begin with the understand-
ing that in all but the rarest of circumstances, a
life-without-parole sentence will be disproportionate
for the juvenile offender at issue. For that reason, a

sentencing court must begin its analysis with the understanding that life without parole is, unequivocally, appropriate only in rare cases. Sentencing courts are to do more than pay mere lip service to the demands of *Miller*. A sentencing court must operate under the understanding that life without parole is, more often than not, not just inappropriate, but a violation of the juvenile's constitutional rights. As explained in *Montgomery*:

> *Miller*, then, did more than require a sentencer to consider a juvenile offender's youth before imposing life without parole; it established that the penological justifications for life without parole collapse in light of the distinctive attributes of youth. Even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects unfortunate yet transient immaturity. Because *Miller* determined that sentencing a child to life without parole is excessive for all but the rare juvenile offender whose crime reflects irreparable corruption, it rendered life without parole an unconstitutional penalty for a class of defenders because of their status— that is, juvenile offenders whose crimes reflect the transient immaturity of youth. [*Montgomery*, 577 US at ___; 136 S Ct at 734 (citations and quotation marks omitted).]

We note that nearly every situation in which a sentencing court is asked to weigh in on the appropriateness of a life-without-parole sentence will involve heinous and oftentimes abhorrent details. After all, the sentence can only be imposed for the worst homicide offenses. However, the fact that a vile offense occurred is not enough, by itself, to warrant imposition of a life-without-parole sentence. The court must undertake a searching inquiry into the particular juvenile, as well as the particular offense, and make the admittedly difficult decision of determining whether this is

the truly rare juvenile for whom life without parole is constitutionally proportionate as compared to the more common and constitutionally protected juvenile whose conduct was due to transient immaturity for the reasons addressed by our United States Supreme Court. And in making this determination in a way that implements the stern rebuke of *Miller* and *Montgomery*, the sentencing court must operate under the notion that more likely than not, life without parole is not proportionate.

That this approach is required under *Miller* becomes even more apparent when one considers the warnings in *Roper, Graham,* and *Miller* about how difficult it is for even a trained psychologist, let alone a sentencing judge, to make a definitive determination regarding a juvenile's capacity for reform. See *Roper*, 543 US at 573 (remarking that the transient qualities of youth make determinations about a juvenile's capability for reform exceedingly difficult). In fact, the Court in *Graham*, 560 US at 77-78, felt so strongly about the difficulty of distinguishing "the few incorrigible juvenile offenders from the many that have the capacity for change" that it rejected—in the case of nonhomicide juvenile offenders—a case-specific sentencing scheme similar to the one it later adopted in *Miller,* and decided that because the determination was so difficult, it would instead impose a categorical ban in nonhomicide cases. Because MCL 769.25 permits a case-by-case determination upon the filing of the requisite motion, trial courts must operate with the understanding that, more likely than not, a life-without-parole sentence is disproportionate for the juvenile offender being sentenced. Indeed, as the Supreme Court warned in *Roper, Graham,* and *Miller,* given the unique and transient qualities of youth, even the most thorough, well-intentioned, and earnest sentencing courts en-

counter a significant risk of reaching the wrong con-
clusion about a juvenile's character being irreparably
corrupt. And this risk carries with it the grave conse-
quences of violating the Eighth Amendment and of
denying an undeserving individual—who it must be
remembered is nevertheless deserving of significant
punishment because of the conviction—an opportunity
to leave the prison he or she entered while still a child.
It was not a hollow exercise for the Supreme Court in
*Miller* and *Montgomery* to repeatedly emphasize how
rarely a life-without-parole sentence will be propor-
tionate. Hence, we emphasize the caution with which a
sentencing court must view the imposition of life
without parole for juvenile offenders.

### C. STANDARD OF APPELLATE REVIEW

The same concerns noted above exist on appeal
when a juvenile challenges the imposition of his or her
life-without-parole sentence. That leads us to a second
question, one raised by the prosecution and one that is
inherently necessary in weighing in on defendant
Hyatt's sentence in the instant case. That is, given the
limited circumstances in which a life-without-parole
sentence is proportionate and constitutional, what is
the appropriate standard of appellate review for that
sentence?

As noted by our Supreme Court in *People v Mil-
bourn*, 435 Mich 630, 635; 461 NW2d 1 (1990), our
Legislature, in setting forth a range of appropriate
punishments for criminal offenses, has entrusted sen-
tencing courts with the responsibility of selecting the
appropriate punishment from statutorily authorized
sentencing ranges. These sentencing ranges embody
the "principle of proportionality" because they allow a
sentencing judge to tailor the sentence to the particu-

lar offense and offender at issue. *Id*. Accordingly, the *Milbourn* Court believed "that the Legislature's purpose" in enacting such a scheme was "best served by requiring judicial sentencing discretion to be exercised according to the same principle of proportionality that has guided the Legislature in its allocation of punishment over the entire spectrum of criminal behavior." *Id*. at 635-636. See also *id*. at 651 ("The Legislature then left to the judiciary, with regard to most crimes, the task of determining the sentence to be imposed upon each offender within given bounds."). The limit on the judicial discretion to be exercised when imposing penalties is that the punishment should be proportionate to the offender and the offense. *Id*. at 651-652. Hence, appellate review of the sentence imposed is for abuse of discretion, to determine whether the sentence violates the principle of proportionality, "which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender." *Id*. at 636, 654.

Turning to the instant case, we believe that the appropriate standard of review for cases in which a judge imposes a sentence of life without parole on a juvenile defendant is a common three-fold standard, the likes of which are applied in a variety of contexts. Any fact-finding by the trial court is to be reviewed for clear error, any questions of law are to be reviewed de novo, and the court's ultimate determination regarding the sentence imposed is to be reviewed for an abuse of discretion. See *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013) (describing the standard of review for a sentencing court's findings of fact and conclusions of law); *Milbourn*, 435 Mich at 636, 654 (applying the abuse-of-discretion standard to sentencing review).

However, the abuse-of-discretion standard requires further explanation in this context. Because of the unique nature of the punishment of a life-without-parole sentence for juveniles and the mitigating qualities of youth, we are obligated to clarify what the abuse-of-discretion standard should look like in the context of life-without-parole sentences for juveniles. As will be discussed in more detail later in this opinion, we hold that the imposition of a life-without-parole sentence on a juvenile requires a heightened degree of scrutiny regarding whether a life-without-parole sentence is proportionate to a particular juvenile offender, and even under this deferential standard, an appellate court should view such a sentence as inherently suspect.

To provide meaningful appellate review under an abuse-of-discretion standard for a life-without-parole sentence imposed on a juvenile, the reviewing court must remain mindful that life without parole is the maximum punishment that may be imposed for a juvenile offender under MCL 769.25. That this is the harshest penalty available under the law raises the stakes not just for the defendant, but also for appellate review of the trial court's sentencing decision. Hence, appellate review of a life-without-parole sentence imposed on a juvenile cannot be a mere rubber-stamping of the penalty handed out by the sentencing court. In *Milbourn*, our Supreme Court repeatedly warned that the maximum penalty available under the law is to be imposed for only the most serious offenders and the most serious offenses; otherwise, it would risk failing the proportionality test. *Milbourn*, 435 Mich at 645-646. To impose the maximum possible penalty "in the face of compelling mitigating circumstances would run against this principle [of proportionality] and the legislative scheme." *Id.* at 653. Therefore, in terms of

appellate review, a reviewing court is justifiably skeptical of a sentence that represents the maximum available punishment, because such punishment is only available in limited, i.e., the most serious and extreme, circumstances. See *id.* at 654. To impose the maximum possible penalty, the case must "present a combination of circumstances placing the offender in . . . the most serious . . . class with respect to the particular crime . . . ." *Id.* at 654. Accordingly, sentencing courts should guard against routinely imposing the most severe penalty authorized by statute. *Id.* at 645. Moreover, we pay heed to *Milbourn*'s cautionary sentiment that the unjust imposition of a maximum sentence has the potential to shake "[t]he public's faith in the just and fair administration of justice . . . ." *Id.*

We use the language employed in *Milbourn* as our starting point, but point out that *Milbourn*'s sentiments ring even truer in the case of life-without-parole sentences for juveniles. Those sentences are deemed to be an "unconstitutional penalty for a class of defendants because of their status—that is, juvenile offenders whose crimes reflect the transient immaturity of youth." *Montgomery*, 577 US at ___; 136 S Ct at 734 (citation and quotation marks omitted). Applying the cautionary language of *Milbourn*—that the imposition of the harshest possible punishment is to be reserved and rendered with caution—in the context of *Miller*'s and *Montgomery*'s repeated and express warnings about how infrequently a life-without-parole sentence will be constitutionally proportionate for juveniles, we are convinced that appellate review, although done under the abuse-of-discretion standard, should consider a juvenile life-without-parole sentence as inherently suspect. While we do not suggest a presumption against the constitutionality of that sentence, we would be remiss not to note that review of that sen-

tence requires a searching inquiry into the record with the understanding that, more likely than not, a life-without-parole sentence imposed on a juvenile is disproportionate. See, generally, *Miller*, 567 US at 473; *Milbourn*, 435 Mich at 645-646. See also Farrell, *Strict Scrutiny Under the Eighth Amendment*, 40 Fla St U L Rev 853, 856 (2013) (stating that there is "reason to be skeptical" of the idea that life without parole—a particularly harsh penalty—is proportionate for a class of offenders such as juveniles who are widely recognized as having lessened culpability). Indeed, as the Court warned in *Milbourn*, 435 Mich at 653, "[w]ith regard to the principle of proportionality, it is our judgment that the imposition of the maximum possible sentence *in the face of compelling mitigating circumstances would run against this principle . . . .*" (Emphasis added.) In *Roper*, *Miller*, *Graham*, and *Montgomery*, the Supreme Court consistently described the numerous ways in which mitigating circumstances—which are compelling enough given the characteristics of youth to warrant a categorical bar on mandatory life-without-parole sentences—are often present in the case of juveniles on account of their youth. These mitigating circumstances —and the need for proper consideration of mitigating circumstances in an individualized sentencing scheme —were the driving force behind *Miller*'s prohibition on mandatory life-without-parole sentences for juveniles. And *Miller* and *Montgomery* repeatedly emphasized that a life-without-parole sentence will only be constitutionally proportionate for the truly rare juvenile.

Accordingly, to give effect to our Supreme Court's decision in *Milbourn* and the United States Supreme Court's direction in *Miller* and *Montgomery*, an appellate court must conduct a searching inquiry and view as inherently suspect any life-without-parole sentence

imposed on a juvenile offender under MCL 769.25. See *Roper*, 543 US at 570 (announcing that the differences between juveniles and adults "render suspect any conclusion that a juvenile falls among the worst offenders"). An appellate court must give meaningful review to a juvenile life-without-parole sentence and cannot merely rubber-stamp the trial court's sentencing decision.

As a tool for undertaking this appellate review, we find it appropriate to borrow from a framework employed by some federal courts. As noted, MCL 769.25 requires weighing a variety of factors in determining whether the juvenile being sentenced is the rare juvenile offender for whom life without parole is an appropriate sentence. In determining whether the sentencing court abused its discretion in weighing the factors and arriving at its conclusion, we find instructive the following analysis found in *United States v Haack*, 403 F3d 997, 1004 (CA 8, 2005), noting certain situations that constitute an abuse of discretion:[18]

> A discretionary sentencing ruling, similarly, may be [an abuse of discretion] if a sentencing court fails to consider a relevant factor that should have received significant weight, gives significant weight to an improper or irrelevant factor, or considers only appropriate factors but nevertheless commits a clear error of judgment by arriving at a sentence that lies outside the limited range of choice dictated by the facts of the case.

---

[18] In *People v Steanhouse*, 313 Mich App 1, 43-44, 46-47; 880 NW2d 297 (2015), lv gtd 499 Mich 934 (2016), this Court declined to apply *Haack*, because that case concerned sentencing factors listed in 18 USC 3553(a), and sentencing courts in Michigan are not required to look at those factors. In this case, by contrast, because a juvenile life-without-parole sentence requires consideration of the *Miller* factors, we find instructive *Haack*'s description of certain situations that constitute an abuse of discretion.

### D. THE INSTANT CASE

Turning to the instant case, we find the trial court committed an error of law by failing to adhere to *Miller*'s and *Montgomery*'s directives about the rarity with which a life-without-parole sentence should be imposed. When deciding to sentence defendant Hyatt to life without parole, the trial court focused on the *Miller* factors. However, the court gave no credence to *Miller*'s repeated warnings that a life-without-parole sentence should only be imposed on the rare or uncommon juvenile offender. This is inconsistent with both *Miller* and *Montgomery*.[19] Indeed, the Court's decisions in *Miller* and *Montgomery* make clear that sentencing a juvenile to life without parole is more than a simple consideration of a set of factors. In order to give any meaning to *Miller*'s discussions about proportionality and the mitigating circumstances associated with youth, a sentencing court must heed *Miller*'s discussion of how rarely a life-without-parole sentence will be proportionate. In order to warrant the imposition of a life-without-parole sentence, the juvenile must be, as *Miller* unequivocally stated, the truly rare individual who is incapable of reform.[20]

Moreover, with regard to the sentencing decision in the instant case, we are concerned that the trial court, in concluding that life without parole was warranted in this case, emphasized the opinion of the psychologist who testified at the *Miller* hearing that defendant

---

[19] We would be remiss if we did not note that the trial court lacked the benefit of *Montgomery* at the time of sentencing.

[20] As noted earlier, we acknowledge that, as articulated as far back as *Roper*, this determination is a difficult one to make. We also note that MCL 769.25 and *Miller* offer little in terms of guidance as to *how* to make this difficult decision. Nevertheless, the current statutory system is the one under which we are required to operate.

Hyatt's prognosis for change *in the next five years* was poor. This focus on a short, five-year period for redemption cannot be reconciled with *Miller*, which holds that a life-without-parole sentence will be proportionate for the juvenile who is irreparably corrupt and incapable of change—not one who is incapable of change within the next five years. The capacity for change within five years hardly seems of any relevance to the decision of whether an individual who committed a crime while a minor is *irreparably* corrupt and, thus, will remain corrupt and wholly incapable of rehabilitation for the remainder of his or her life expectancy, which could easily be another 60 to 80 years.

Given all that occurred at the sentencing hearing in this case, we feel compelled to remand for resentencing; the trial court must not only consider the *Miller* factors, but decide whether defendant Hyatt is the truly rare juvenile mentioned in *Miller* who is incorrigible and incapable of reform. Accordingly, we reverse defendant Hyatt's sentence and remand to the trial court for resentencing. On resentencing, the court is to implement the directives of *Miller* and *Montgomery* and to be mindful that those cases caution against the imposition of a life-without-parole sentence except in the rarest of circumstances. Hence, it should operate with the understanding that, more likely than not, life without parole is a disproportionate sentence for defendant Hyatt.

## V. CONCLUSION

We resolve the conflict created between the prior panel in this case and the majority in *Skinner* by concluding that a judge, not a jury, must determine whether to sentence a juvenile to life without parole under MCL 769.25. With regard to the instant case, we

vacate defendant Hyatt's sentence and remand for further proceedings consistent with this decision. We do not retain jurisdiction.

SHAPIRO, P.J., and MARKEY and STEPHENS, JJ., concurred with BECKERING, J.

BECKERING, J. (*concurring*). The task for this conflict panel is limited; we are asked to decide whether a judge or a jury is to determine whether a juvenile should be sentenced to life without parole under MCL 769.25. This question presumes that it is constitutionally permissible in Michigan to impose a life-without-parole sentence on juvenile offenders who commit the worst homicide offenses. I write a separate concurrence to voice my concern that this underlying premise is a faulty one. Although the issue was raised by defendant, it is unpreserved, scantily briefed, and better left for another day. Were we to address it, I would conclude that a sentence of life without parole for a juvenile offender constitutes cruel or unusual punishment in violation of the Michigan Constitution.[1] Given the United States Supreme Court's conclusions regarding the inherent difficulties in reliably assessing whether a still-developing juvenile is irreparably corrupt, the case-by-case individual sentencing scheme

[1] In *People v Carp*, 496 Mich 440; 852 NW2d 801 (2014), vacated sub nom *Davis v Michigan*, 577 US ___; 136 S Ct 1356 (2016), our Supreme Court concluded that a juvenile life-without-parole sentence was not cruel or unusual under the Michigan Constitution. However, in light of the fact that the opinion in *Carp* was vacated, and because I believe that *Carp*'s analysis did not address the problems associated with the imprecise and speculative nature of assessing irreparable corruption when deciding whether to impose a life-without-parole sentence on an individual who committed an offense while a minor, I voice my concerns in this concurring opinion, if only to ask our Supreme Court to consider the issue in the future.

set forth in MCL 769.25 is far too imprecise an exercise to pass muster under the Michigan Constitution. Instead, after a minimum term of years such as that set forth in MCL 769.25(9), the determination should be left to the Parole Board, which has the benefit of a more fully developed individual and a number of years in which the individual can prove himself or herself worthy of parole.

In *Miller v Alabama*, 567 US 460, 479; 132 S Ct 2455; 183 L Ed 2d 407 (2012), the Supreme Court declined to expressly address whether the Eighth Amendment required a categorical bar on life without parole for juvenile offenders. However, when one sifts through *Miller*'s various warnings—(1) how juveniles are categorically less deserving of the harshest possible punishment that can be imposed on them, (2) how the penological justifications for imposing the harshest punishment dissipate when the characteristics of juvenile offenders are considered, (3) the inherent difficulty in making determinations about a juvenile's character at the time of sentencing, and (4) how rarely such a sentence will be proportionate—one could conceivably determine that a life-without-parole sentence for a juvenile offender is, at best, constitutionally suspect. At the very least, to the extent *Miller* left open the window for juvenile life-without-parole sentences for the rare or uncommon juvenile, see *id.* at 479-480, that window should be understood as being very narrow.

Nonetheless, whether life without parole for juveniles should be categorically barred by the Eighth Amendment is not my concern in the present case. Rather, I question whether life without parole for juveniles should be categorically barred under the Michigan Constitution, which prohibits cruel *or* un-

usual punishment.[2] Const 1963, art 1, § 16. Our Courts have generally found that the prohibition contained in Const 1963, art 1, § 16 affords greater protection than the Eighth Amendment and that it requires a closer inquiry of the punishment at issue. *People v Benton,* 294 Mich App 191, 204; 817 NW2d 599 (2011); *People v Nunez,* 242 Mich App 610, 618 n 2; 619 NW2d 550 (2000).

My concerns about the imprecise nature of determining whether a juvenile offender is irreparably corrupt—although, it must be remembered, that juvenile is not immune from punishment because of his youth—stem from our increasing scientific knowledge regarding the human brain, from our recognition that a juvenile is different from an adult because of his or her diminished culpability and greater capacity for reform, and from the idea that the characteristics of youth make a determination of irreparable corruption or permanent incorrigibility exceedingly difficult. As to the first point, United States Supreme Court precedent makes clear that juveniles often lack the same degree of culpability that adult offenders possess. Juveniles lack maturity and are often more prone than adults to reckless behavior and risk-taking. See *Miller,* 567 US at 471. And, as noted by the Court in *Miller,* juveniles are subject to influences—such as a home environment from which the juvenile cannot normally extricate himself or herself—in a way not typically experienced by adults. *Id.* Finally, juvenile offenders, because of the stages of cognitive development, often have a greater capacity for reform than

---

[2] I am not the first to opine that lifetime imprisonment of a juvenile offender violates the Michigan Constitution. See *People v Eliason,* 300 Mich App 293, 332-336; 833 NW2d 357 (2013) (GLEICHER, J., concurring in part and dissenting in part).

adult offenders. *Id.* Stated differently, juveniles inherently have a certain degree of malleability—because of their immaturity—that adults lack. As a result, it would be "misguided" morally "to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed." *Roper v Simmons*, 543 US 551, 570; 125 S Ct 1183; 161 L Ed 2d 1 (2005). Accordingly, juveniles should be treated differently from adults for purposes of sentencing, particularly in regard to the imposition of the most serious punishment that can be imposed on juvenile offenders: life without parole. The punishment of life without parole for juveniles caused the United States Supreme Court to break rank from the long-standing idea that "death is different" when making comparisons between different types of punishment, and inspired the Court to liken life-without-parole sentences for juveniles to the death penalty for adult offenders. *Miller*, 567 US at 470; *Graham v Florida*, 560 US 48, 69-71; 130 S Ct 2011; 176 L Ed 2d 825 (2010).

As to my second and greater concern, the difficult nature of making individual determinations about juvenile offenders can be gleaned from a comprehensive reading of *Roper*, *Graham*, and *Miller*. Starting in *Roper*, 543 US at 569, the Supreme Court recognized that the characteristics of youth "demonstrate that juvenile offenders *cannot with reliability be classified among the worst offenders*." (Emphasis added.) This proclamation was based, in large part, on studies related to the death penalty and juveniles, which caused the Court in *Roper* to remark that "[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare

juvenile offender whose crime reflects irreparable corruption." *Roper*, 543 US at 573. As the point is made in the majority opinion in the instant case, if this determination is difficult for a trained psychologist, how much more difficult is it for a sentencing judge or an appellate court on review?

The idea that the characteristics of youth make difficult, if not impossible, accurate determinations about a juvenile's capacity for change continued in *Graham* and *Miller*. In *Graham*, 560 US at 68, the Court called attention to pertinent research, explaining that "parts of the brain involved in behavior control continue to mature through late adolescence." This continued development and the pliable nature of juveniles necessarily make it difficult to reliably classify a juvenile as being the rare juvenile who is incapable of change. *Id*. The Court in *Graham*, 560 US at 77-78, felt so strongly about the difficulty of distinguishing "the few incorrigible juvenile offenders from the many that have the capacity for change" that it rejected—in the case of nonhomicide juvenile offenders—a case-specific sentencing scheme similar to that implemented in MCL 769.25.[3] Because a determination about a juvenile's character was so difficult to make, the Court instead imposed a categorical ban on life without parole in nonhomicide cases.

The concern noted in *Roper* and *Graham* still remains: it is exceedingly difficult, given the qualities of youth, to make a reliable determination regarding whether a juvenile is truly incorrigible and incapable

---

[3] While it could be argued that the Supreme Court in *Miller* gave its blessing to such a scheme for juveniles who commit homicide offenses, it should be noted that the question whether there should be a categorical ban on life without parole for juvenile homicide offenders was not before the *Miller* Court, and the Court expressly declined to consider the issue. *Miller*, 567 US at 479.

of change. This concern led the Court in *Miller*, 567 US
at 476, 479, to explain that proportionate life-without-
parole sentences, to the extent they could even be
imposed, would be "uncommon" and "rare," because
"youth is more than a chronological fact," and "its
signature qualities are all transient." Furthermore,
the studies on which *Roper*, *Graham*, and *Miller* relied
have continued validity and applicability: in reversing
the sentence of a juvenile defendant sentenced to life in
prison without parole, the Iowa Supreme Court dis-
cussed the argument that professionals have difficulty
predicting the course of juvenile development, noting
that the American Psychology Association had filed an
amicus brief in *Miller*, in which it posited that " '[t]he
positive predictive power of juvenile psychotherapy
assessments . . . remains poor.' " *State v Sweet*, 879
NW2d 811, 828-829 (Iowa, 2016) (citation omitted).

Given the difficulty of predicting when a juvenile is
truly incapable of change and thus deserving of a
life-without-parole sentence, the admitted lack of reli-
ability in a case-by-case sentencing approach, and the
significance of the sentencing decision, I believe that
imposing a life-without-parole sentence on a juvenile is
far too speculative and that it constitutes cruel or
unusual punishment under the Michigan Constitution.
In this regard, I find particularly compelling *Roper*'s
warning that the type of classification required by
MCL 769.25 cannot be done with reliability by a
trained psychologist, let alone a sentencing court.
*Roper*, 543 US at 573. I also find compelling that the
Supreme Court in *Graham*, 560 US at 77-78, expressly
rejected a case-by-case approach, albeit in the context
of nonhomicide offenses, for determining when life
without parole would be appropriate for juveniles. The
fact that the sentence at issue in the present case

involves a homicide offense does not mean that the determination to be made with regard to the juvenile offender's character—his immaturity, depravity, vulnerability to outside influence, culpability, or capacity for change—is markedly less difficult. Nor, for that matter, does the fact that the conviction involves a homicide offense necessarily take account of the "special difficulties encountered by counsel in juvenile representation" that were noted by *Graham*—such as the fact that juveniles generally mistrust adults (including defense counsel), have limited understanding of the criminal justice system, are generally less capable of weighing the long-term consequences of plea offers, and are likely less capable of assisting with their own defense. These difficulties further illustrate the problems inherent in a case-by-case approach such as the one at issue in this case. *Graham*, 560 US at 78-79. In short, the fact that the instant case involves a homicide offense does nothing to dispel the concerns that led the Court in *Graham* to reject the type of case-by-case sentencing approach that is currently in effect under MCL 769.25. On this point, the *Miller* Court explained that although *Graham*'s ban on life without parole applied in nonhomicide cases,

> none of what [*Graham*] said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime-specific. Those features are evident in the same way, and to the same degree when . . . a botched robbery turns into a killing. So *Graham*'s reasoning implicates *any life-without-parole sentence* imposed on a juvenile, even as its categorical bar relates only to nonhomicide offenses. [*Miller*, 567 US at 473 (emphasis added).][4]

---

[4] Again, while the Court in *Miller* was cognizant of these very concerns, it declined to expressly weigh in on the issue whether a juvenile life-without-parole sentence was cruel *and* unusual punish-

For this reason, simply arguing that the instant case is
different from *Graham* because it involves a homicide
offense ignores that which is most pertinent in deter-
mining whether the punishment is cruel or unusual for
juveniles: that the characteristics of youth and its
attendant circumstances make juveniles constitution-
ally different for purposes of sentencing, and it is
extremely difficult to determine, with any degree of
reliability, which juveniles are truly deserving of life
without parole. By imposing a life-without-parole sen-
tence, the sentencing court necessarily concludes at
the outset that the individual who committed a crime
when he or she was a minor will continue to be corrupt
at the age of 20, 30, 40, 50, 60, 70, and, for that matter,
at every age until he or she dies.

I believe that the concerns noted by the Court in
*Miller*, *Graham*, and *Roper* are applicable in the case
at hand. These cases essentially teach us that a sen-
tencing judge is, to a large degree, guessing whether
the juvenile is capable of reform, on the basis of
information that is widely recognized as unreliable
given the malleability of a juvenile's still-developing
brain. This is not to fault the sentencing judge tasked
with trying to decide whether to impose life without
parole. I have no doubt that sentencing courts exercise
the utmost care and professionalism in determining
whether this particular punishment, or any punish-
ment, is appropriate and proportionate. The constitu-
tional concern I see is not based on a lack of diligence
or professionalism by the sentencing judge, but the
very nature of the inquiry that is made when he or she
decides whether to impose life without parole on juve-

_____

ment under the United States Constitution, but it nevertheless went out
of its way to emphasize how rarely this type of sentence would be
constitutionally proportionate.

nile offenders. A sentencing judge tasked with determining whether to impose a life-without-parole sentence is faced with an arduous task. Simply put, as the United States Supreme Court has repeatedly warned, this task requires an inquiry that is based on poor predictors, and that inquiry cannot be answered with a sufficient degree of reliability because of a juvenile's still-developing sense of maturity and, in general, the greater capacity that juveniles have for reform. And this task, it must be remembered, carries with it the exceedingly high risk of imposing a disproportionate sentence that violates the juvenile's constitutional rights. As noted in *Montgomery v Louisiana*, 577 US ___; 136 S Ct 718, 734; 193 L Ed 2d 599 (2016), "[e]ven if a court considers the child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects unfortunate yet transient immaturity." (Citations and quotation marks omitted.)

Thus, I note my concerns that the speculative nature inherent in imposing a life-without-parole sentence on juvenile homicide offenders renders the punishment cruel or unusual under the Michigan Constitution. If the imposition of the harshest possible penalty available under the law cannot be done with any degree of reliability given the offender being a minor about whom the court must predict his or her entire future, how can the sentence not be rendered either cruel due to guesswork or unusually unfair? By their chronological status as minors, juvenile offenders spend more time in prison for a life-without-parole offense than any adult. However, because they were minors when they committed their offense, they were in a less culpable class of offenders according to our United States Supreme Court. How could such a speculative, roll-of-the-dice approach to meting out the most seri-

ous punishment on a group of offenders who are categorically less culpable not be cruel or unusual punishment? One need only examine his or her own character, judgment, maturity level, impetuosity, and susceptibility to influence at the ages of 14,[5] 15, 16, and 17 years of age and contrast these same traits as they exist at the age of 40 or older, as that marks the age range in which a juvenile offender will be after completing only the bare minimum 25 years for a minimum sentence under MCL 769.25(9). While juvenile offenders are certainly deserving of punishment for their offenses, the task of accurately pegging the rare individual who is truly irreparably corrupt is simply too imprecise and speculative to pass muster under Michigan's Constitution.

Turning to the instant case, the *Miller* hearing that took place for defendant Hyatt serves as a prime illustration of the lack of reliability involved in making a determination about a juvenile's still-forming character. The psychologist who testified in this case had a Ph.D. in educational and clinical psychology and had been a practicing psychologist for approximately 40 years. Yet when pressed on cross-examination regarding whether she thought defendant Hyatt was capable of change, she admitted: "I have no way of predicting whether he is going to be able to change his course. . . . I cannot say with certainty that he, that he's totally unredeemable." I highlight this not as an indictment of the doctor's qualifications or abilities, but to point out that the doctor admitted the same concerns noted earlier in this opinion: even a trained psychologist has essentially no way of knowing what will become of

---

[5] Or even younger than 14, for that matter, as Michigan law allows for juveniles younger than 14 years of age to be tried as adults. See MCL 712A.2d; MCL 712A.4.

defendant Hyatt's character—or that of any other juvenile, for that matter—in the future or whether he has the capacity to change at some point in his lifetime.

The solution to this complex problem is relatively simple: let the Parole Board do its job. The Parole Board will have the benefit of the juvenile offender's full cognitive development through adulthood, as well as years of institutional records and behavior with which to make the decision. Rather than asking a sentencing court to essentially make its best guess based on information that is admittedly not adequate for the task at hand, why not allow the Parole Board—which has the benefit of time, incarceration records, and further cognitive development by the juvenile—to make the decision? However, this is not to suggest that a juvenile should be *guaranteed* parole. Rather, the only entitlement is that the individual, who entered prison while still a child, should have the chance to show that he or she is capable of reform, and has indeed demonstrated the requisite level of reform to merit consideration for parole. As stated in *Graham*, 560 US at 75, juveniles should be given "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." If a juvenile offender is truly the rare individual who is irreparably corrupt, that condition will surely manifest itself and be verified during the lengthy term of incarceration the individual will have served before becoming parole-eligible. Likewise, determining whether the individual, now with the benefit of further cognitive development and maturation, is capable of reform and change will be far less speculative by that point in time. Allowing the Parole Board to make this determination gives a juvenile a chance at parole after his or her character is more fully formed, rather than at a

time when that character is, by all accounts, "a work in progress." *Sweet*, 879 NW2d at 839.

I am not alone in adhering to this view. Recently, the Iowa Supreme Court, which has written rather extensively on a variety of juvenile life-without-parole issues after *Miller*, concluded that the Iowa Constitution, which mirrors the United States Constitution and bars cruel *and* unusual punishment, forbids a case-by-case approach and categorically bars imposition of life-without-parole sentences for juveniles. In this regard, the Iowa court concluded "that the enterprise of identifying which juvenile offenders are irretrievable at the time of trial *is simply too speculative and likely impossible given what we now know about the timeline of brain development and related prospects for self-regulation and rehabilitation*." *Sweet*, 879 NW2d at 836-837 (emphasis added). As noted by the Iowa Supreme Court, studies on the timeline and phenomenon of juvenile brain development explain why "smart adolescents sometimes do really stupid things." *Id.* at 837, citing Steinberg, *Age of Opportunity: Lessons from the New Science of Adolescence* (Mariner Books: Houghton Mifflin Harcourt, 2014), p 69.[6] And, remarked the Iowa court, the *Miller* factors are themselves "fraught with risks" of misapplication, because some factors could necessarily be viewed as weighing in favor of life without parole and against it at the same time.[7] *Sweet*, 879 NW2d at 838. All of this leads back to the original point: it is extremely problematic to require a sentencing court to make "speculative

---

[6] It is not until the third and final phase of brain development, which takes place "into the early twenties," when individuals " 'get better at controlling their impulses, thinking about the long-term consequences of their decisions, and resisting peer pressure.' " *Sweet*, 879 NW2d at 837, quoting *Age of Opportunity*, p 71.

[7] As an example, the court asked:

up-front decisions on juvenile offenders' prospects for
rehabilitation because they lack adequate predictive
information supporting such a decision." *Id.* at 839.
"[T]he risk of error" in determining whether a life-
without-parole sentence is proportionate "is unaccept-
ably high" at the time of sentencing; this high risk of
error caused the Iowa Supreme Court to impose a
categorical ban on life-without-parole sentences for
juveniles. *Id.* at 837. According to the Iowa Supreme
Court, a sentencing court

> cannot apply the *Miller* factors in any principled way to
> identify with assurance those very few adolescent offend-
> ers that might later be proven to be irretrievably de-
> praved. In short, we are asking the sentencer to do the
> impossible, namely, to determine whether the offender is
> "irretrievably corrupt" at a time when even trained pro-
> fessionals with years of clinical experience would not
> attempt to make such a determination. [*Id.*]

> [W]hat significance should a sentencing court attach to a juvenile
> offender's stable home environment? Would the fact that the
> adolescent offender failed to benefit from a comparatively positive
> home environment suggest he or she is irreparable and an unlikely
> candidate for rehabilitation? Or conversely, would the offender's
> experience with a stable home environment suggest that his or her
> character and personality have not been irreparably damaged and
> prospects for rehabilitation are therefore greater?
>
> * * *
>
> A similar quandary faces courts sentencing juvenile offenders
> who have experienced horrendous abuse and neglect or otherwise
> have been deprived of a stable home environment. Should the
> offenders' resulting profound character deficits and deep-seated
> wounds count against the prospects for rehabilitation and in
> favor of life-without-the-possibility-of-parole sentences under the
> *Miller* framework? Or should sentencing courts view the depri-
> vation of a stable home environment as a contraindication for life
> without the possibility of parole because only time will tell
> whether maturation will come with age and treatment in a
> structured environment? [*Sweet*, 879 NW2d at 838.]

Furthermore, although the speculative nature of imposing life-without-parole sentences on juveniles is enough to raise serious concerns about those sentences under the Michigan Constitution, it should be noted that with regard to the practice of permitting life-without-parole sentences for juveniles, Michigan appears to be in danger of standing on the wrong side of history. In the wake of *Miller*, a growing number of states have decided to prohibit, or in some cases not seek, life-without-parole sentences for juveniles. See, e.g., Mills et al, *Juvenile Life Without Parole in Law & Practice: Chronicling the Rapid Change Underway*, 65 Am U L Rev 535, 552, 560 (2016); The Sentencing Project, *Juvenile Life Without Parole: An Overview* <http://www.sentencingproject.org/ publications/juvenile-life-without-parole/> (accessed June 29, 2016) [https://perma.cc/U94J-MLBS]; Equal Justice Initiative, *Philadelphia District Attorney Declares Life-Without-Parole Sentences Inappropriate for Juveniles* <http://www.eji.org/philadelphia-da-says-life-without-parole-inappropriate-for-juveniles> (accessed June 28, 2016) [https://perma.cc/7EZF-8H4D]; Equal Justice Initiative, *Utah Joins Growing Number of States that Have Abolished Juvenile Life Without Parole Sentences* <http://eji.org/news/utah-abolishes-juvenile-life-without-parole> (accessed June 28, 2016) [https://perma.cc/SD2U-767C]; News Center 1, *South Dakota Bans Life-Without-Parole Sentences for Youth* <http://www.newscenter1.tv/story/31497823/south-dakota-bans-life-without-parole-sentences-for-youth> (accessed June 15, 2016) [https://perma.cc/YHW7-GQHK]; The Campaign for the Fair Sentencing of Youth, *States that Ban Life Without Parole for Children* <http://fairsentencingofyouth.org/reports-and-reresearch/sentenceeliminated/> (accessed July 6, 2016)

[https://perma.cc/UTC5-YPT3].[8] I note that in evaluating whether a punishment is cruel, unusual, or both, it is not only the number of states that authorize a particular penalty that is of importance; *"the consistency of the direction of change"* must be examined as well. *Atkins v Virginia*, 536 US 304, 315; 122 S Ct 2242; 153 L Ed 2d 335 (2002) (emphasis added). The number of states eliminating life-without-parole sentences in light of *Miller* leaves one fearing that Michigan, one of a handful of states responsible for the most juvenile life-without-parole sentences, see *Juvenile Life Without Parole in Law & Practice*, 65 Am U L Rev at 571-572, is on the wrong side of the recent direction of change. This is particularly so in light of the recent reluctance in states like Pennsylvania to seek juvenile life-without-parole sentences, given that Pennsylvania was, along with Michigan, one of only a few states responsible for a majority of juvenile life-without-parole sentences. See *Juvenile Life Without Parole in Law & Practice*, 65 Am U L Rev at 571-572. This recent trend illustrates that the island on which Michigan sits with regard to this particular sentencing practice is becoming increasingly lonelier.

Finally, even if a categorical ban is off the table in light of *Carp*, I would be remiss not to note, in light of the same concerns raised earlier, what I view as

---

[8] There is also an effort currently underway in the United States District Court for the Eastern District of Michigan to ban life-without-parole sentences for juvenile offenders. See White, *Federal Judge Stops Juvenile Lifer Sentencing Process*, The Detroit News (July 7, 2016), available at <http://www.detroitnews.com/story/news/local/michigan/2016/07/07/michigan-juvenile-resentencing/86810456/> (accessed July 8, 2016) [https://perma.cc/7L55-YH4P]. See also *Hill v Snyder*, unpublished opinion of the United States District Court for the Eastern District of Michigan, issued January 30, 2013 (Docket No. 10-14568), vacated and remanded on other grounds, 821 F3d 763 (CA 6, 2016).

significant holes in the Legislature's implementation of the *Miller* decision in MCL 769.25. Even if the Michigan Constitution does not compel a categorical ban on the imposition of juvenile life-without-parole sentences, the concerns inherent with sentencing juveniles to life without parole do not suddenly diminish. It is not as if the unreliable and unreasonably difficult task of determining which juvenile offenders are truly incorrigible and incapable of change vanishes by rejecting a categorical ban on life without parole for juveniles. Those concerns must be addressed, or our courts risk the arbitrary and capricious imposition of juvenile life-without-parole sentences.

The legislative response to *Miller* in MCL 769.25 does not go far enough in addressing these concerns. The Supreme Court's decision in *Miller* announced the destination that is required by the Eighth Amendment—individualized sentencing that limits the imposition of life-without-parole sentences to only those rare individuals who are irreparably corrupt—but did little to address how to arrive at that destination. The Court even recognized as much in *Montgomery*, 577 US at ___; 136 S Ct at 734-735, when it stated that *Miller* was largely a substantive rule and left to the states the responsibility for implementing procedures to comply with *Miller*. *Miller*, it could be said, set forth the *minimum* that must be done. The response in Michigan, MCL 769.25, offers little in the way of procedural requirements beyond the bare minimum that *Miller* articulated. The statute requires a hearing at which the trial court is to consider the "*Miller* factors," but otherwise is silent, save for announcing that the trial court can hold a hearing and consider evidence and that any victims must be given the right to appear or make a statement. See MCL 769.25(6) and (7). Essen-

tially, the statute requires a sentencing court to "do *Miller*" and nothing more.

In order to implement *Miller* in a way that affords meaning and substance to the decision, we must provide sentencing courts with more direction, instruction, and information to guide the sentencing process. While the ultimate determination as to what procedures should be employed is not before the Court in this conflict case, I offer a few brief suggestions. Drawing on comparisons to death penalty cases first made in *Graham* and repeated in *Miller*, the employment of a defense team that includes two attorneys, a mitigation specialist, and an investigator, as is done in death penalty cases, may go some distance toward alleviating the difficulties inherent in determining whether a juvenile is irreparably corrupt. See Drinan, *Juvenile Sentencing Post-Miller: Preventive & Corrective Measures*, 2015 Wis L Rev 203, 209-210 (2015). See also The Campaign for the Fair Sentencing of Youth, *Trial Defense Guidelines: Representing a Child Client Facing a Possible Life Sentence*, available at <http://fairsentencingofyouth.org/wp-content/uploads/2015/03/Trial-Defense-Guidelines-Representing-a-Child-Client-Facing-a-Possible-Life-Sentence.pdf> (accessed July 6, 2016) [https://perma.cc/UTP3-N4KN].[9] Further, provisions could be made for a sentencing court to hear testimony from a variety of expert witnesses in a way that shines further light on some of the subjects that mark the determination to be made with so much uncertainty. These include, to name a few, subjects such as juvenile brain development, immaturity, intellectual capacity, susceptibility to influences such as peer pres-

---

[9] These guidelines are modeled in part after the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases. *Trial Defense Guidelines*, p 5 n 2.

sure and family pressure, the effect of the juvenile's background, if any, and the capacity for reform. See *Trial Defense Guidelines*, p 20. As noted by the Iowa Supreme Court in *Sweet*, 879 NW2d at 835, when it briefly considered how to attempt to accurately sentence juveniles to life-without-parole sentences in a way that could pass constitutional muster under the Eighth Amendment: "the process for making the determination of which offenders are most culpable would be resource intensive, require expert testimony, and would not be a matter left to the unguided discretion of the sentencer." The process described by MCL 769.25 is not resource-intensive, makes no mention of expert testimony, and places few restrictions, if any, on the discretion of the sentencer. Those defects, which the majority opinion goes some distance toward remedying, should, in my opinion, be addressed.

SHAPIRO, P.J., concurred with BECKERING, J.

METER, J. (*concurring in part and dissenting in part*). I concur in Parts I, II, and III of the majority opinion. I would not, however, vacate defendant Kenya Hyatt's sentence and remand this case for resentencing.

The *Milbourn*[1] concept of proportionality provides an adequate framework for review of sentences such as the one imposed in the present case. The sentencing court explicitly mentioned and adhered to the principle of proportionality. In addition, the sentencing court, as noted by the panel in *People v Perkins*, 314 Mich App 140, 179; 885 NW2d 900 (2016), explicitly took the *Miller* factors into consideration.

---

[1] *People v Milbourn*, 435 Mich 630; 461 NW2d 1 (1990).

The majority opinion focuses on the following statement by a psychologist regarding defendant Hyatt's capacity for change: "[I]f I were to predict in five years, it would not be possible."[2] This statement, however, was merely one aspect of the testimony and other evidence appropriately taken into consideration by the sentencing court. In addition, while the court did not explicitly use the term "rare" as employed in *Miller v Alabama*, 567 US 460, 479; 132 S Ct 2455, 2469; 183 L Ed 2d 407 (2012), and *Montgomery v Louisiana*, 577 US ___; 136 S Ct 718, 733; 193 L Ed 2d (2016), the record makes clear that the court applied the applicable concepts from *Miller* in deciding that a sentence of life without parole was appropriate despite defendant Hyatt's status as a juvenile.

Moreover, the pertinent circumstances—including that defendant Hyatt was the actual shooter, had a history of assaultive behavior, appeared to a counselor to have no conscience, showed no remorse or concern over the crimes, was "disconnected from societal morals and mores," had "serious maladjustment," and was 17 years old at the time of the offenses—clearly supported the sentence. See, generally, *Miller*, 567 US at 475-476. The sentencing court specifically noted that defendant Hyatt's age was not a mitigating factor in this particular case, and the court adequately set forth evidence showing that defendant Hyatt's potential for rehabilitation was low. In *Miller*, *id.* at 478, the Supreme Court stated that a mandatory sentence of life without parole "disregards the possibility of rehabilitation even when the circumstances most suggest it." Here, the circumstances did not "most suggest it."

---

[2] The psychologist further stated that she simply could not predict whether defendant Hyatt would change.

I find no violation of the principle of proportionality and no need to remand this case. The sentencing procedure was constitutional and the sentence was proportionate to the circumstances surrounding the offense and the offender.

I would affirm the sentence.

M. J. KELLY and RIORDAN, JJ., concurred with METER, J.